Sue ALLBRITTON, Appellant,

v.

UNION PUMP COMPANY, Appellee.

No. 09–93–191 CV.

Court of Appeals of Texas,
Beaumont.

Submitted May 26, 1994.

Decided June 23, 1994.

Tommy L. Yeates, Moore, Landrey, Garth & Jones, Beaumont, for appellant.

Roger McCabe, David B. Gaultney, Mehaffy & Weber, Beaumont, for appellee.

Before WALKER, C.J., BROOKSHIRE and BURGESS, JJ.

## OPINION

BROOKSHIRE, Justice.

Appellant brings this timely appeal from the granting of a summary judgment adverse to her. Appellant brought suit to recover damages for personal injuries. She alleged a cause of action against appellee, Union Pump Company, for personal injuries, which she allegedly sustained as a result of a pump explosion and a fire that occurred on or about September 4, 1989. The explosion and the fire took place on the premises of Texaco Chemical at Port Arthur. Appellant was a new, trainee employee of Texaco Chemical. She was an assistant operator trainee. She alleges as a result of her injuries that she has incurred in excess of $50,000 in medical expenses and has been unable to return to her employment. She has alleged causes of action against the appellee based on common law negligence and on theories of strict tort liability.

Copious amounts of discovery were pursued and completed. After this, the appellee filed a motion for summary judgment. The district judge granted the motion for summary judgment in favor of Union Pump Company on the issue of causation.

The sole point of error is in substance that the trial court erred in rendering summary judgment against the appellant, Sue Allbritton, and in favor of appellee, Union Pump Company. This point of error, so framed, invokes the rules set out in *Malooly Brothers, Inc. v. Napier*, 461 S.W.2d 119 (Tex. 1970); *Reese v. Beaumont Bank, N.A.*, 790 S.W.2d 801 (Tex.App.—Beaumont 1990, no writ). The appellant, by her several pleadings and her last pleading, took the position that the fire was caused by a defective pump manufactured by appellee.

The fire was a very dangerous and large one. After the fire was reported, the appellant was ordered to go to the location of the fire in order to assist in extinguishing the fire. These duties were part of her job responsibilities. The appellant was actually leaving her employment at the end of her shift when the notification of the fire reached her. During the course of performing her job duties and responsibilities as instructed, appellant alleged that she sustained serious, permanent, and disabling injuries to both of her knees, to her back, and to other parts of her body. She alleged that the defective pump and the resulting fire were both a producing cause of her injuries as well as a proximate cause of her injuries. Appellant alleged theories in her live pleadings of negligence, gross negligence, and her right to recover pursuant to the terms and provisions of RESTATEMENT (SECOND) OF TORTS § 402A (1965). The appellant alleged numerous defects in the pump in question. The pump had failed and caused at least two fires prior to the fire in question that caused Sue's injuries. She clearly invoked the doctrines of both proximate cause and producing cause.

Basically, the appellee took the position that its pump was not either a proximate cause or a producing cause of the appellant's injuries. The pump company has also urged that the appellant's actions as well as her training supervisor's actions were actually intervening causes of the injuries alleged.

Proper summary judgment proof proffered by the appellant included depositions as well as an affidavit. This proof showed that a certain pump, being numbered pump 21P202 was manufactured by the appellee. It caught on fire. This particular pump caught on fire on at least two prior occasions. These occasions were before September 4, 1989. Additionally, the same pump had become inflamed after the appellant's alleged injuries said to have been sustained on September 4, 1989.

This fire occurred around 9:30 p.m. to 9:45 p.m. At this point, the appellant was actually in the process of leaving the plant at the time of the pump fire. Her supervisor was Felipe Subia, Jr. They were stopped and directed to assist in extinguishing the fire. The fire was shown to be very large. Numerous individuals were involved in fighting the fire. The situation was an emergency. There is testimony that it took about an hour and a half to extinguish the flames. During this period of time, the appellant was discharging her duties and responsibilities. Some of these activities included stringing out hoses, setting up portable fire monitors and equipment, and turning off certain crucial supply valves.

A certain type of chemical foam was also utilized to extinguish the flames. There is a string of evidence that the area of the fire was covered in water and foam. The water and foam were described as being about calf high by Subia. The foam on one witness rose to just below his knee. *The standing water was described as being everywhere and the drainage in that area was not good.* The water was described as covering an area of about three quarters of an acre and the foam was on top of this large body of water. The foam was sprayed widely and it got on other buildings and equipment. The foam was described as a fairly light material. Again, it was testified to that the foam and the water was pretty much everywhere. *The foam was used extensively* to cut off the oxygen which lack of oxygen or absence of oxygen would in turn suppress and extinguish the fire.

Later, Subia, accompanied by Sue, was directed to block in a nitrogen purge valve. Sue assisted in the performance of this task. In order to reach the crucial nitrogen purge valve, Subia and Sue walked across a certain above ground pipe rack. This means of access was used to save crucial time. This crossing of the pipe rack was declared necessary, it being the closest and shortest route available to the nitrogen purge valve. The pipes were covered with foam and Subia and Sue crossed the same without trouble. Under the record, this particular route was shown to be the most practical and the most efficacious and efficient from the standpoint of saving time as well as for other reasons. The record reflects that if another route had been taken, it would have involved an additional ten minutes time. The route used by Subia and Sue took only about three minutes. Subia and Sue crossed and traversed the pipe rack without mishap.

However, after walking to the area where the purge valve was located, Subia, as supervisor, received further instructions from his superior not to perform this particular task. Then, Subia and Sue walked back across the pipe rack. On this return, Sue slipped and fell seriously injuring her knees and back. Appellant has undergone several surgical operations.

Under the proper, proffered summary judgment proof, we conclude that certain genuine issues of material facts were raised and that the summary judgment was improvidently granted.

The fire and the pump and the resulting huge fire was a dramatic event. Subia and Sue necessarily had to act and react quickly. The actions of Sue had to be gauged in view of the relevant, material, and startling surrounding circumstances. Subia also testified that the situation facing him and Sue was a difficult situation. He also stated that this pump had many fires. He was aware of at least two fires involving this particular pump. He testified that they could walk across the pipes without any problems if a person is careful in walking across the same. There were other persons who walked across this pipe rack. There is one strain of evidence that just about everybody walked across this pipe rack.

Apparently, Subia had walked across the pipe rack dozens of times. It should be born in mind that the record clearly reflects that Sue was going through a training program and she was a trainee. She was to follow the instructions and actions of Subia. We perceive that it was normal and natural for a trainee to follow the actions of her supervisor. Sue had been working under her supervisor for only one full week. The fire occurred during her second week of training under Subia. Subia testified that he never saw Sue do anything that was unsafe.

The fire occurred when the graveyard shift was coming in to relieve Subia and Sue. Sue was getting into her car because she was taking Subia to the gate to leave the plant at the end of her shift. The fire whistle blew. A higher supervisor, one Mr. Leroy Bosier, stopped them and directed them to fight the fire. Subia and Sue went straight to the fire rapidly as instructed. The pump involved was known as a large, electric, shipping pump. These large shipping pumps were used to ship material and products over long distances. Hence, these large pumps are not used on a daily basis or even a weekly basis. But they are used on a monthly basis to ship products as far away as Port Neches and Port Arthur. Subia had learned and had also been taught how to fight fires. However, Sue had not gone through this same type of training. She was relatively inexperienced. The safety department required Subia and Sue to wear certain types of boots while fighting a fire. In the record we find:

Q After you and Ms. Allbritton had put your gear on, how did the fire appear at that time? Was it just a huge fire—

A (Interrupting) Very huge. Very huge.

Q What area was actually on fire?

A The pumps itself.

Q Were both 202 and 202–S on fire?

A No, it was just 202. It was so big, it looked like both of them were on fire; but the other one wasn't.

The record clearly reflects that the fire was so huge that about 30 people fought the fire. The employer called in Port Neches and also Port Arthur for help. These municipalities were on standby. During the fighting of the fire, Sue and Subia actually used and held fire hoses and also foam hoses and used monitors. The monitors were used to keep a constant flow or volume of water directed at the fire. Subia was satisfied with Sue's performance during the fire and stated that she handled it real good. After the fire was controlled, the record reflects a very large area was covered with standing water and this area extended beyond where the pumps were.

■ The foam was described as being pretty much everywhere. Subia could hear the purge valve emitting something and he was instructed to block it in. Sue and Subia went to the valve but then Subia was instructed from the control house. The control house said do not block in the nitrogen purge valve. Subia had a portable radio and was in constant contact with the control house. Under this emergency situation, we perceive that this situation of confusion and stress created genuine issues of material facts as contemplated under Tex.R.Civ.P. 166a concerning the actions of appellant and the appellee. The appellee had taken the pump to its facility on two prior occasions for repairs. It certainly is not shown as a matter of law that Sue was negligent or negligent to the degree of 51 percent or more. We also perceive that because of the extremely large area covered by the water and the foam that Sue's following her supervisor was not necessarily negligent. Certainly the manufacturer could reasonably foresee should a third fire develop in the pump that the premises owner would use water and foam to fight the fire and that the water and the foam would be used extensively to fight the fire and would cover a large area. Under this record, as presented, Subia and Sue had to walk through a certain amount of water and foam regardless of what means of exit they used. Under the theory of strict liability and tort a plaintiff need only show a defective pumps and producing cause. Even so, we opine that Sue raised the issue of proximate cause and negligence, against appellee.

■ The doctrine of proximate cause encompasses the two well known elements of both cause in fact and foreseeability; the doctrine of producing cause is drastically different. See Brown v. Edwards Transfer Co., Inc., 764 S.W.2d 220 (Tex.1988); El Chico Corp. v. Poole, 732 S.W.2d 306 (Tex.1987); Gulf States Utilities Co. v. Dryden, 735 S.W.2d 263 (Tex.App.—Beaumont 1987, no writ).

■ A cause in fact, as an element of proximate cause, requires only that the negligent act or the negligent omission was a substantial factor in bringing about the complained of injuries and without which no injuries or harm would have occurred. See Missouri Pac. R. Co. v. American Statesman,

552 S.W.2d 99 (Tex.1977). Foreseeability is met and satisfied by showing that a person of ordinary intelligence would have anticipated the danger to others by his acts or omissions. Foreseeability does not require an actor to anticipate just how any particular injuries will result. *See Clark v. Waggoner*, 452 S.W.2d 437 (Tex.1970).

■■■ Noteworthy is the factor that the pump involved caught on fire a number of times raising, we think, the issue of a defective pump coupled with other probative evidence. Foreseeability does not require that the defendant anticipate the exact manner or the precise mode in which the injury will occur. Nor does foreseeability require that the wrongdoer or the tort-feasor anticipate the particular accident—but only that the tort-feasor reasonably anticipates the general character of the injuries. *See El Chico Corp. v. Poole, supra.* Importantly, the foreseeability requirement in proximate cause does not require that the wrongdoer anticipate the precise hazard or the exact consequences that may grow out of a dangerous or emergency situation. *Harvey v. Stanley*, 803 S.W.2d 721 (Tex.App.—Fort Worth 1990, writ denied).

■■■ Under the theory of products liability, the causation requirement is established as "producing cause". "Producing cause" has been defined and established in law as being an efficient, exciting, or contributing cause which in a natural sequence produces the injuries or the damages for which the claimant seeks recovery. *Milam Development v. 7*7*0*1 Wurzbach*, 789 S.W.2d 942 (Tex.App.—San Antonio 1990, writ denied). *See Rourke v. Garza*, 530 S.W.2d 794 (Tex. 1975). Foreseeability is not a requirement of producing cause. We determine under this record that the issue of producing cause was raised.

■■■ But the appellee urges that any of the alleged acts or omissions on the part of Sue or her supervisor constituted, as a matter of law, a new and independent cause of the appellant's injuries. We disagree with this proposition. The doctrine of new and independent cause requires that an independent force rather than the alleged acts of the parties involved must be responsible for the claimants injuries. The term "new and independent cause" has been defined as "the act or omission of a separate and independent agency, which destroys the causal connection between the negligent act or omission of the defendant and the injury complained of, and thereby becomes, in itself, the immediate cause of such injury." *See Eoff v. Hal and Charlie Peterson Found.*, 811 S.W.2d 187 (Tex.App.—San Antonio 1991, n.w.h.). We determine that but for the defective pump and the resulting huge fire in question, the appellant would not have been at the scene of the fire because appellant's shift was ending, her relief had already arrived, and she was in the process of motoring away from the job. But for the fire, the appellant would not have crossed the pipe rack in question in order to attempt to turn off the nitrogen purge valve. Nor would the appellant had been wearing required special boots and foot wear; nor would the extensive water and the extensive foam have been in the area in question where she received her injuries amounting allegedly and resulting allegedly in $50,000 of medical expenses alone.

In this emergency situation Subia was at first notified to get over to the nitrogen purge valve and block it off or shut it off and Subia testified that he just turned around and Sue followed him and Subia, following his habit, walked in a direct manner towards the valve and in doing so walked across the pipe rack. It was natural for Sue to follow him as a mere trainee. She dared not strike out on her own course. Subia stated that it was necessary for him to walk across the pipe rack "to block it in". Sue merely followed her boss. The record shows that these two had to walk over the pipe rack to get to the area where they could block off the purge valve.

Q So, you had to walk over the pipe rack on the west side; and you were in the process of getting to the valve or you were to the area that you were going to block off and you were notified not to do that?

A Not to do that.

This and similar testimony, we think, negates the defense of new and independent cause. The pipes that were necessarily

crossed were already wet and the water and the foam was already on top of them and this condition existed because of the fire. And this condition arose out of the necessary fighting of a huge fire. We think all these facts and circumstances should be considered by a jury of Sue's peers. All these circumstances raise genuine issues of material facts. Subia saw Sue fall, he saw her knees hit and he saw her fall to her side. He heard Sue immediately complain about pain and she immediately said that she had hurt her knee which she described as her good knee. She was not able to stand up.

The safety department called an ambulance. They placed Sue on a stretcher and they put her in an ambulance. She was taken to Park Place Hospital immediately. We think under this record that it would be for the jury to pass upon Sue's actions (as a first or second week trainee) in following the actions of her immediate supervisor. We reverse the judgment and remand the case for a full trial on the merits.

### The Evidence of George Greene, Jr., an Expert

An expert, George Greene, Jr., testified. He was familiar with the Union Pump involved. He had repaired these Union Pumps. He was familiar with the use of these pumps. Greene stated that he knew about this very same pump and he knew about its manufacturer. Greene had served as a vice-president of engineering in a company that repaired these same pumps. This expert testified that Union Pump was aware of the prior fires because Union Pump had caused the repairs to the pumps before and after the fires. There were actual repair orders and other documents to indicate this knowledge was visited upon Union Pump. These types of pumps were sent back in for repairs, being fire damaged pumps.

This expert was of the opinion that there had been bearing failures in the pumps. Greene testified that in his opinion the prior fires were caused by bearing failures. The bearings were not properly lubricated. He testified (we paraphrase) that leaking would begin but to have a large catastrophic failure where you are going to have a lot of material coming out that that situation usually involves the bearings or bearing failures involving the bearing seal. Then he corrected himself and said it was just bearings. It was his opinion that when the bearings fail this pump has a real problem and if this pump is used in an intermittent service or standby service then it is likely to have failures of the bearing which in turn would cause catastrophic failure of the seals. This expert testified further that Union Pump must say and warn: "This pump cannot be used for standby service unless it's equipped with a protective device such as Lubrimist." This type of information and warning must go to Texaco. Of course, under products liability law there can be a defect in the marketing and defects in the failure to warn and defects in lack of proper instructions. Thus, we think the issues of liability under the doctrine of strict tort liability have been raised. This expert again described this pump as defective especially in this particular use, being an intermittent use. The pump may be okay for a continuous use where it will lubricate the crucial bearings but this pump cannot be used as a standby pump or used on an intermittent basis and on that ground the pump was clearly defective. This defect was that in standby use the bearings were not sufficiently lubricated. Some parts of the bearings became dry and heat resulted. This was expert opinion and it is Hornbook law that expert opinion raises issues and the weight thereof is to be passed upon by the peers of Sue. This expert also testified that this pump is defective in design because:

[I]f you do not design the bearing lubrication system so it submerges the bearing— *or lubricates the bearing in all conditions, then you have to put some exclusions on the use of the pump;* and they have to be very—warnings, basically.... this pump must not be—must be used continually, or must not be used as a standby pump or— because of this lubrication problem.

In other words, that's what I'm saying. It's perfectly all right in many applications. It's just not any good in this application. (emphasis added)

It is a fair statement to say that the expert was saying that there had to be specific warnings about the application and the use of the pump in question. We also find:

Q. ... You are talking in terms of warnings or instructions on the use of the pump?

A. Or build a system that you have—your bearings are submerged until it starts. That's very easy to do. I've modified centrifugal pumps like that before. It's very easy to design a system where you'll never have that problem without installing the Lubrimist on there.

Greene said further:

A. ... Lubrimist is just one technique. Union Pump could have easily solved this problem themselves where you would never have to buy anything to protect those bearings. It would come with the pump.

Q. And that's where you are talking about total immersion?

A. Sure.

Q. Okay. Well, is that the other alternative—

A. What I'm saying is, right, if you are not going to provide that protection, then you have to be sure that there is a warning or a limitation to the use of this pump, is all I'm saying, sir.

Q. All right. So, if I understand you correctly, what you're saying is that either Union Pump should have totally immersed the bearings or provided a warning to Texaco. Is that accurate? Concerning, what?

A. Well, I mean, a warning is—you know, there is a—in the manual itself, it talks about the danger—or, it doesn't talk about the danger. It talks about the problem of not having the bearings submerged but that does not necessarily constitute a warning, you know; but you're right.

There should be a decal on the pump itself, a placard, that limits the use of this pump if you're not going to provide total lubrication protection for the bearings.

Q. And by "total lubrication protection," what do you mean?

A. Well, you could do it by a spray mist system of some type or you could do it by submerging the bearings or you could do it by inserting the atmosphere in the bearings—in other words, you'd have a drying system—the venting system to the atmosphere would go through a little dryer. You know, if you keep moisture out of there, then you are going to prevent the corrosion that will occur.

There is many ways that you can protect the bearings.

Q. Do you know of any manufacturers that use the venting system that you described?

A. Yes, sir. Sure. A lot of manufacturers.

We sustain appellant's point of error.

REVERSED AND REMANDED.