UNION PUMP COMPANY, Petitioner,

v.

Sue ALLBRITTON, Respondent.

No. 94–0878.

Supreme Court of Texas.

Argued Feb. 9, 1995.

Decided May 11, 1995.

Rehearing Overruled June 8, 1995.

David B. Gaultney, Vickie Thompson, Beaumont, for petitioner.

Tommy L. Yeates, Jon B. Burmeister, Beaumont, for respondent.

OWEN, Justice.

The issue in this case is whether the condition, act, or omission of which a personal injury plaintiff complains was, as a matter of law, too remote to constitute legal causation. Plaintiff brought suit alleging negligence, gross negligence, and strict liability, and the trial court granted summary judgment for the defendant. The court of appeals reversed and remanded, holding that the plaintiff raised issues of fact concerning proximate and producing cause. 888 S.W.2d 833. Because we conclude that there was no legal causation as a matter of law, we reverse the judgment of the court of appeals and render judgment that plaintiff take nothing.

On the night of September 4, 1989, a fire occurred at Texaco Chemical Company's facility in Port Arthur, Texas. A pump manufactured by Union Pump Company caught fire and ignited the surrounding area. This particular pump had caught on fire twice before. Sue Allbritton, a trainee employee of Texaco Chemical, had just finished her shift and was about to leave the plant when the fire erupted. She and her supervisor Felipe Subia, Jr., were directed to and did assist in abating the fire.

Approximately two hours later, the fire was extinguished. However, there appeared to be a problem with a nitrogen purge valve, and Subia was instructed to block in the valve. Viewing the facts in a light most favorable to Allbritton, there was some evidence that an emergency situation existed at that point in time. Allbritton asked if she could accompany Subia and was allowed to do so. To get to the nitrogen purge valve, Allbritton followed Subia over an above-ground pipe rack, which was approximately two and one-half feet high, rather than going around it. It is undisputed that this was not the safer route, but it was the shorter one. Upon reaching the valve, Subia and Allbritton were notified that it was not necessary to block it off. Instead of returning by the route around the pipe rack, Subia chose to walk across it, and Allbritton followed. Allbritton was injured when she hopped or slipped off the pipe rack. There is evidence that the pipe rack was wet because of the fire and that Allbritton and Subia were still wearing fireman's hip boots and other firefighting gear when the injury occurred. Subia admitted that he chose to walk over the pipe rack rather than taking a safer alternative route because he had a "bad habit" of doing so.

Allbritton sued Union Pump, alleging negligence, gross negligence, and strict liability theories of recovery, and accordingly, that the defective pump was a proximate or producing cause of her injuries. But for the pump fire, she asserts, she would never have walked over the pipe rack, which was wet with water or firefighting foam.

Following discovery, Union Pump moved for summary judgment. To be entitled to summary judgment, the movant has the burden of establishing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548 (Tex.1985). A defendant who moves for summary judgment must conclusively disprove one of the elements of each of the plaintiff's causes of action. *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex. 1991). All doubts must be resolved against

Union Pump and all evidence must be viewed in the light most favorable to Allbritton. *Id.* The question before this Court is whether Union Pump established as a matter of law that neither its conduct nor its product was a legal cause of Allbritton's injuries. Stated another way, was Union Pump correct in contending that there was no causative link between the defective pump and Allbritton's injuries as a matter of law?

▮ Negligence requires a showing of proximate cause, while producing cause is the test in strict liability. *General Motors Corp. v. Saenz,* 873 S.W.2d 353, 357 (Tex.1993). Proximate and producing cause differ in that foreseeability is an element of proximate cause, but not of producing cause. *Id.* Proximate cause consists of both cause in fact and foreseeability. *Travis v. City of Mesquite,* 830 S.W.2d 94, 98 (Tex.1992); *Missouri Pac. R.R. Co. v. American Statesman,* 552 S.W.2d 99, 103 (Tex.1977); *Nixon,* 690 S.W.2d at 549. Cause in fact means that the defendant's act or omission was a substantial factor in bringing about the injury which would not otherwise have occurred. *Prudential Ins. Co. v. Jefferson Assocs.,* 896 S.W.2d 156 (Tex.1995); *Nixon,* 690 S.W.2d at 549; *Havner v. E-Z Mart Stores, Inc.,* 825 S.W.2d 456, 458–59 (Tex.1992). A producing cause is "an efficient, exciting, or contributing cause, which in a natural sequence, produced injuries or damages complained of, if any." *Haynes & Boone v. Bowser Bouldin, Ltd.,* 896 S.W.2d 179 (Tex.1995); *Rourke v. Garza,* 530 S.W.2d 794, 801 (Tex.1975). Common to both proximate and producing cause is causation in fact, including the requirement that the defendant's conduct or product be a substantial factor in bringing about the plaintiff's injuries. *Prudential,* 896 S.W.2d at 161; *Lear Siegler,* 819 S.W.2d at 472 n. 1

(quoting RESTATEMENT (SECOND) OF TORTS § 431 cmt. e (1965)).

▮ At some point in the causal chain, the defendant's conduct or product may be too remotely connected with the plaintiff's injury to constitute legal causation. As this Court noted in *City of Gladewater v. Pike,* 727 S.W.2d 514, 518 (Tex.1987), defining the limits of legal causation "eventually mandates weighing of policy considerations." *See also Springall v. Fredericksburg Hospital and Clinic,* 225 S.W.2d 232, 235 (Tex.Civ.App.—San Antonio 1949, no writ), in which the court of appeals observed:

> [T]he law does not hold one legally responsible for the remote results of his wrongful acts and therefore a line must be drawn between immediate and remote causes. The doctrine of "proximate cause" is employed to determine and fix this line and "is the result of an effort by the courts to avoid, as far as possible the metaphysical and philosophical niceties in the age-old discussion of causation, and to lay down a rule of general application which will, as nearly as may be done by a general rule, apply a practical test, the test of common experience, to human conduct when determining legal rights and legal liability."

*Id.* at 235 (quoting *City of Dallas v. Maxwell,* 248 S.W. 667, 670 (Tex.Comm'nApp.1923, holding approved)).

▮ Drawing the line between where legal causation may exist and where, as a matter of law, it cannot, has generated a considerable body of law.[1] Our Court has considered where the limits of legal causation should lie in the factually analogous case of *Lear Siegler, Inc. v. Perez, supra.* The threshold issue was whether causation was negated as a matter of law in an action where negligence and product liability theories were asserted.

---

1. In the seminal decision in *Palsgraf v. Long Island Railroad Co.,* 248 N.Y. 339, 162 N.E. 99 (1928), for example, a railway guard knocked explosives from under the arm of a passenger who was hurrying to board a train. The resulting explosion caused scales some distance away to fall on Palsgraf. The majority in *Palsgraf* held that as a matter of law, the defendant owed no duty to Palsgraf because "[t]he risk reasonably to be perceived defines the duty to be obeyed; ... it is risk to another or to others within the range of apprehension." *Id.* 162 N.E. at 100. In his dissent in *Palsgraf,* Judge Andrews opined that the decision should turn not on duty but on proximate cause. In analyzing proximate cause, he recognized:

> What we do mean by the word "proximate" is that, because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point.

*Id.* at 103 (Andrews, J., dissenting).

Perez, an employee of the Texas Highway Department, was driving a truck pulling a flashing arrow sign behind a highway sweeping operation to warn traffic of the highway maintenance. *Id.* at 471. The sign malfunctioned when wires connecting it to the generator became loose, as they had the previous day. *Id.* Perez got out of the truck to push the wire connections back together, and an oncoming vehicle, whose driver was asleep, struck the sign, which in turn struck Perez. *Id.* Perez's survivors brought suit against the manufacturer of the sign. In holding that any defect in the sign was not the legal cause of Perez's injuries, we found a comment to the *Restatement (Second) of Torts*, section 431, instructive on the issue of legal causation:

> In order to be a legal cause of another's harm, it is not enough that the harm would not have occurred had the actor not been negligent.... The negligence must also be a substantial factor in bringing about the plaintiff's harm. The word "substantial" is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called "philosophic sense," which includes every one of the great number of events without which any happening would not have occurred.

*Lear Siegler,* 819 S.W.2d at 472 (quoting RESTATEMENT (SECOND) OF TORTS § 431 cmt. a (1965)).

As this Court explained in *Lear Siegler,* the connection between the defendant and the plaintiff's injuries simply may be too attenuated to constitute legal cause. 819 S.W.2d at 472. Legal cause is not established if the defendant's conduct or product does no more than furnish the condition that makes the plaintiff's injury possible. *Id.* This principle applies with equal force to proximate cause and producing cause. *Id.* at 472 n. 1.

This Court similarly considered the parameters of legal causation in *Bell v. Campbell,* 434 S.W.2d 117, 122 (Tex.1968). In *Bell,* two cars collided, and a trailer attached to one of them disengaged and overturned into the opposite lane. A number of people gathered, and three of them were attempting to move the trailer when they were struck by another vehicle. *Id.* at 119. This Court held that the parties to the first accident were not a proximate cause of the plaintiffs' injuries, reasoning:

> All acts and omissions charged against respondents had run their course and were complete. Their negligence did not actively contribute in any way to the injuries involved in this suit. It simply created a condition which attracted [the plaintiffs] to the scene, where they were injured by a third party.

*Id.* at 122.

In *Bell,* this Court examined at some length decisions dealing with intervening causes and decisions dealing with concurring causes. The principles underlying the various legal theories of causation overlap in many respects, but they are not coextensive. While in *Bell,* this Court held "the injuries involved in this suit were not proximately caused by any negligence of [defendants] but by an independent and intervening agency," *id.,* we also held "[a]ll forces involved in or generated by the first collision had come to rest, and no one was in any real or apparent danger therefrom[,]" *id.* at 120, and accordingly, that the "[defendants'] negligence was not a concurring cause of [the plaintiffs'] injuries." *Id.* at 122. This reasoning applies with equal force to Allbritton's claims.

Even if the pump fire were in some sense a "philosophic" or "but for" cause of Allbritton's injuries, the forces generated by the fire had come to rest when she fell off the pipe rack. The fire had been extinguished, and Allbritton was walking away from the scene. Viewing the evidence in the light most favorable to Allbritton, the pump fire did no more than create the condition that made Allbritton's injuries possible. We conclude that the circumstances surrounding her injuries are too remotely connected with Union Pump's conduct or pump to constitute a legal cause of her injuries. *See Lear Siegler,* 819 S.W.2d at 472.

Accordingly, we reverse the judgment of the court of appeals and render judgment that plaintiff take nothing.

PHILLIPS, Chief Justice, and GONZALEZ, HIGHTOWER, HECHT, GAMMAGE and ENOCH, Justices, join.

CORNYN, Justice, concurring.

I concur in the Court's judgment, but for different reasons than those given in its opinion. I would hold that although the defective pump was a cause-in-fact of Sue Allbritton's injury, neither Union Pump's negligence nor the defective pump was a legal cause of her injury. Because the Court's opinion conflates foreseeability and other policy issues with its cause-in-fact analysis, I do not join its opinion. The Court's approach is not without precedent, *see Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470 (Tex.1991); however, I believe this expansive view of cause-in-fact obscures a proper causal analysis, and that this case presents an opportunity to clarify that analysis.

## I. Development of Causation

A few words about the historical development of causation analysis in American jurisprudence provide a helpful context.[1] Throughout much of the nineteenth century, the doctrine of objective causation was the predominant theory of causation. *See* MORTON J. HOROWITZ, THE TRANSFORMATION OF AMERICAN LAW 1870–1960, 51–52 (1992). This doctrine posited that through proper analysis, judges could scientifically determine which act in a series of events actually caused the plaintiff's injury. *Id.* at 52. "Proximate cause" was one of the basic expressions of this doctrine, along with "the

notion of a distinction between 'proximate' cause and 'remote' cause." *Id.* Implicit was the belief that one cause would prove to be the scientific proximate cause, and the single responsible defendant would be identified and held legally accountable.

By the turn of the century, the doctrine of objective causation was subject to serious criticism. Oliver Wendell Holmes, Jr., and Leon Green, along with other members of the Legal Realist movement, argued that "because judges and jurists inevitably imported moral ideas into their determinations of legal causation, they were making discretionary policy determinations under the guise of doing science." *Id.* at 53; *see also* LEON GREEN, RATIONALE OF PROXIMATE CAUSE 12 (1927) (noting that causal analysis was the point at which "the law-making function of the courts is most frequently employed"). By the 1930s, the Realists' influence was felt in American law by the innovation of a new "distinction between actual or 'but for' causation, on the one hand, and legal or proximate causation, on the other." HOROWITZ, *supra,* at 63.

Judge Andrews' dissenting opinion in *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928), quoted by the Court today, is a classic statement of the Realists' bifurcated view of causation. Examining actual or "but for" causation, Judge Andrews likened the inquiry to observing the ripples in a pond after a stone is thrown into it. Andrews reasoned that the explosion at one end of the platform was clearly the "but for" cause of the injury to Mrs. Palsgraf at the other. But turning to the proximate cause analysis, he explained:

---

1. The rational study of law is still to a large extent the study of history. History must be a part of the study, because without it we cannot know the precise scope of rules which it is our business to know. It is a part of the rational study, because it is the first step toward an enlightened skepticism, that is, towards a deliberate reconsideration of the worth of those rules. When you get the dragon out of his cave on to the plain and in the daylight, you can count his teeth and claws, and see just what is his strength. But to get him out is only the first step. The next is either to kill him, or to tame him and make him a useful animal.

Oliver Wendell Holmes, Jr., *The Path of the Law*, 10 HARV.L.REV. 457, 469–70 (1897). Reexamination of familiar legal doctrines from time to time is also important to maintaining judges' intellectual honesty, and, at least as important, to disclosing to public scrutiny the premises and processes by which judges' decisions are drawn. Public confidence rises or falls to the extent courts succeed or fail in persuading as to the soundness of their reasoning. Especially under our form of limited government, in which the legitimacy of all of our civil institutions is premised on consent of the governed, no less is permissible.

What we ... mean by the word "proximate" is that, because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point. This is not logic. It is practical politics....

....

... There is in truth little to guide us other than common sense.

*Id.* 162 N.E. at 103–04. For the Realists, then, cause-in-fact was a purely factual inquiry, while proximate cause was a policy determination that legal responsibility for damages should not be limitless.

Despite broad support for this approach during the first half of the twentieth century, the terminology used by Green and other Realists was not embraced by the American Law Institute in its first *Restatement of Torts*. Instead, the *Restatement* adopted a more general approach to causation under the banner of "legal cause":

In order that a particular act or omission may be the legal cause of an invasion of another's interest, the act or omission must be a *substantial factor* in bringing about the harm and there must be no principle or rule of law which restricts the actor's liability because of the manner in which the act or omission operates to bring about such invasion.

RESTATEMENT OF TORTS § 9 cmt. b (1934) (emphasis added). Under this definition, the "substantial factor" requirement served a similar role to cause-in-fact, but it was not the purely factual inquiry that the Realists had proposed. *But cf.* WILLIAM L. PROSSER, HANDBOOK OF THE LAW OF TORTS § 47, at 256 (2d ed.1955) (noting that the 1948 revision of the *Restatement of Torts* limited the application of substantial factor analysis to the cause-in-fact inquiry and that substantial factor tests therefore cannot include the policy considerations inherent in the Realists' proximate cause analysis). This refusal to adopt a bifurcated view paved the way for continued debate on proper causal analysis, although the leading treatise writers of the period appeared to adopt the Realist view. *See, e.g.,* PROSSER, *supra,* § 44, at 218–19 ("Causation is a fact. It is a matter of what has in fact occurred.").

More recently, the Legal Realists' bifurcated approach has itself come under attack. The primary conflict arose from the Realists' attempt to separate the fact-based cause-in-fact analysis from the policy-driven proximate cause analysis. As one commentator has noted, some academics insisted that "both inquiries simply camouflage ad hoc policy decisions on ultimate liability," while others insisted that "the two inquiries are merely different steps in the ultimate attribution of responsibility based on commonsense 'causal' principles." Richard W. Wright, *Causation, Responsibility, Risk, Probability, Naked Statistics, and Proof: Pruning the Bramble Bush by Clarifying the Concepts,* 73 IOWA L.REV. 1001, 1009 (1988). This new generation of legal thinkers has generally sought to replace the bifurcated analysis with a flexible, single-step analysis that could be adapted to the relevant issues in any case. Two leading scholars thus described the concept of causation as "a central concept of physical manipulation or intervention round which cluster a whole group of concepts, which can in a broad sense be termed causal, and which are related in different ways to the central case." H.L.A. HART & TONY HONORE, CAUSATION IN THE LAW xxxiii (2d ed.1985). *But see* Wex S. Malone, *Ruminations on Cause–in–Fact,* 9 STAN.L.REV. 60 (1956) (arguing that while considerations of policy inevitably invade the cause-in-fact analysis, just as they do proximate cause, the distinction may nonetheless be valid). Even the later revisions of Prosser's famous treatise, albeit after Prosser's death, retreated from the bifurcated fact/policy analysis that Prosser had championed, and opined that the cause-in-fact determination was policy dependent, and proximate cause was, at least in part, fact-laden. *See* Wright, *supra,* at 1009.

These debates continue today, and the precise content and structure of the causal analysis is, to say the least, unsettled. *See generally* HART & HONORE, *supra,* at xxxiii–lxxxi (discussing the academic debate between: (1) those who would maximize the causal inquiry by introducing policy and other issues into the equation; and (2) causal minimalists who limit causation to factual inquiries); Wright, *supra,* (comparing and contrasting causation

theories of traditional scholars, libertarians, legal economists, realists, and critical legal studies scholars).

## II. Texas Law

The foregoing discussion may help to illuminate the development of causation analysis in Texas law. In negligence, early Texas courts used the term "proximate cause" for the entire causal inquiry, in keeping with the doctrine of objective causation. *See Texas & P. Ry. Co. v. Bigham,* 90 Tex. 223, 38 S.W. 162, 163 (1896) ("The maxim that, 'in law, the immediate, and not the remote, cause of any event, is regarded,' applies to cases of negligence. The negligence must be the proximate cause of the injury."). More recently, this Court has used the Realists' bifurcated causal analysis in negligence law, in which proximate cause is viewed as consisting of two elements: "cause-in-fact" and "foreseeability." *See Hopson v. Gulf Oil Corp.,* 150 Tex. 1, 237 S.W.2d 352, 355 (1951) (citing WILLIAM L. PROSSER, HANDBOOK OF THE LAW OF TORTS § 46, at 321 (1941)); *see also Baumler v. Hazelwood,* 162 Tex. 361, 347 S.W.2d 560, 564 (1961) (noting that cause-in-fact and foreseeability are "two distinct concepts" and defining cause-in-fact in terms of the "but for" test). Even more recently, we have perhaps demonstrated the pervasive influence of post-Realist scholars, describing the cause-in-fact analysis as requiring satisfaction of both the "but for" and the "substantial factor" tests. *See Missouri P. R.R. Co. v. American Statesman,* 552 S.W.2d 99, 103 (Tex.1977) (setting forth the first definition of cause-in-fact that required both tests to be satisfied). The addition of this vague new "substantial factor" doctrine, *see* W. PAGE KEETON ET AL., PROSSER AND KEETON ON TORTS § 41, at 267 (5th ed.1984) (stating that this intuitive term "can scarcely be called a test"), in theory at least, tends to merge the policy-based rationales for limiting liability with the cause-in-fact inquiry.

This evolution of Texas law, paralleling developments throughout the United States, has caused two particular areas of uncertainty relevant to the case at hand. First, Texas law is unclear as to what degree (if any) it has retreated from the fact/policy delineation

in its two-prong causal analysis. While the Court's opinion today appears to reject this bifurcated analysis, I believe that it remains an important and useful part of Texas law. Second, our cases have never clearly defined how the second prong of its proximate cause analysis in negligence cases applies to the producing cause analysis of products liability law. *The Court's opinion undertakes only one analysis, thereby implying that causation in negligence and causation in products liability are treated the same.* To the contrary, I contend that, like the limitations imposed by foreseeability in negligence law, the second part of a complete causal analysis in products liability law imposes policy-oriented limitations consistent with the underlying purposes of products liability law itself, as I explain below.

### A. The Fact/Policy Delineation in Causal Analysis

As I have already indicated, our earliest cases did not separate foreseeability and cause-in-fact when analyzing proximate cause. *See, e.g., Texas & P. Ry. Co. v. Bigham,* 90 Tex. 223, 38 S.W. 162, 164 (1896) ("But for the defective fastening to the gate, the injury could not have happened. ... [A]nd since it was clearly out of the range of reasonable probability that an injury to the person of any one should result, it should be held, as a matter of law, that the negligence of the company gave no right of action for such injuries."). The first Texas Supreme Court case to describe a bifurcated analysis was *Hopson v. Gulf Oil Corp.,* 150 Tex. 1, 237 S.W.2d 352 (1951). The *Hopson* opinion drew primarily from the first edition of Prosser's *Handbook of the Law of Torts,* defining the cause-in-fact element as an inquiry into whether an "act or omission was a substantial factor in bringing about the result" and reasoning that "ordinarily it will be such a substantial factor if the result would not have occurred without it." *Id.* 237 S.W.2d at 355 (citing WILLIAM PROSSER, HANDBOOK OF THE LAW OF TORTS § 46, at 321 (1941)). Given this heavy reliance upon Prosser's treatise, it seems reasonable to conclude that the Court viewed the cause-in-fact analysis as purely

factual, and its application of the law to the facts supports that view. *Id.* at 355–56.

The early cause-in-fact cases applied the "but for" test as the exclusive test for this element. *See, e.g., Hopson,* 237 S.W.2d at 355; *Port Terminal R.R. Ass'n v. Ross,* 155 Tex. 447, 289 S.W.2d 220, 224 (1956); *Baumler v. Hazelwood,* 162 Tex. 361, 347 S.W.2d 560, 564 (1961); *Texas & P. Ry. Co. v. McCleery,* 418 S.W.2d 494, 497 (Tex.1967). Although several of these opinions introduced the "substantial factor" language employed in the *Restatement,* the Court appears to have relied more on the "but for" test than the "substantial factor" formulation in the *Restatement. See, e.g., Port Terminal,* 289 S.W.2d at 224 (concluding that the defendant's negligence was a substantial factor because the injury "would not have been sustained" in the absence of the negligence); *McCleery,* 418 S.W.2d at 497 ("Other than in situations in which the conduct of more than one person contributes to the harm, negligent conduct cannot be regarded as a substantial factor in bringing about the harm if the harm would have been sustained even if the actor had not been negligent.").

By contrast, the *Restatement* relegates the "but for" test to a minor role, allowing courts to eliminate certain acts or omissions from consideration under the broader substantial factor inquiry. The *Restatement* devotes only part of one section to the "but for" test:

> [T]he actor's negligent conduct is not a substantial factor ... if the harm would have been sustained even if the actor had not been negligent.

RESTATEMENT (SECOND) OF TORTS § 432(1) (1965). In contrast, there are several sections dealing exclusively with substantial factors, *see, e.g.,* RESTATEMENT, *supra,* §§ 431, 432(2), 433, and many others dealing with the relationship between the substantial factor test and an ultimate decision on legal causation. *See, e.g.,* RESTATEMENT, *supra,* §§ 435, 437–444, 447. The *Restatement* also envisioned the "but for" test as relevant to only a limited set of circumstances:

> The ["but for" test] is most frequently, although not exclusively, applicable where the actor's tortious conduct consists in a failure to take some precautions which are required for the protection of another's person or land or chattels.

RESTATEMENT (SECOND) OF TORTS § 432 cmt. b.

The earliest Texas courts to use the substantial factor language adopted Prosser's view, rather than that of the *Restatement,* considering that the "substantial factor" test described the cause-in-fact inquiry in a way that is "sufficiently intelligible to the layman" and in a way that "is neither possible nor desirable to reduce ... to lower terms." PROSSER, *supra,* § 44, at 221. While Prosser argued that this formulation was an improvement over the "but for" test, he concluded that "in the great majority of cases, it amounts to the same thing." *Id.* Still, however, he saw both formulations of the cause-in-fact test as a purely factual inquiry. *Id.* at 219.

This Court's opinion in *Missouri Pacific R.R. Co. v. American Statesman,* 552 S.W.2d 99 (Tex.1977), included a subtle change from Prosser's formulation of the cause-in-fact inquiry. In *Missouri Pacific,* cause-in-fact was defined as meaning "that the negligent act or omission was a substantial factor in bringing about the injury *and* without which no harm would have been incurred." *Id.* at 103. (emphasis added). The use of the conjunctive "and" between "substantial factor" and the "but for" test ("without which no harm would have been incurred") appeared to create two distinct tests for cause-in-fact, both of which must be satisfied in every case. Although the *Missouri Pacific* opinion itself appears to apply only the "but for" test, *see id.* at 104, its formulation has been relied upon in many subsequent cases. *See, e.g., McClure v. Allied Stores of Tex., Inc.,* 608 S.W.2d 901, 903 (Tex.1980); *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 549 (Tex.1985); *El Chico Corp. v. Poole,* 732 S.W.2d 306, 313 (Tex.1987). A close examination of the Court's application of the cause-in-fact analysis after *Missouri Pacific,* however, shows little change: the "but for" test appears to predominate and is limited to a factual inquiry in each case.

In 1991, however, the Court arguably changed course once again, breathing life

into the "substantial factor" standard of *Missouri Pacific.* In *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470 (Tex.1991), the Court relied mainly on the definition of "legal cause" from the *Restatement (Second):*

> The negligence must also be a substantial factor in bringing about the plaintiff's harm. The word "substantial" is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using the word in the popular sense, in which there always lurks the idea of responsibility....

*Lear Siegler,* 819 S.W.2d at 472 (quoting RESTATEMENT (SECOND) OF TORTS § 431 cmt. a (1965)). Although the Court acknowledged that Texas had "not adopted the *Restatement (Second) of Torts* in its entirety," the Court did not take note of the important differences between the *Restatement*'s and Prosser's formulations. Instead, the Court applied the *Restatement*'s discussion of "legal cause" to the events before it, and concluded that "these particular circumstances are too remotely connected with Lear Siegler's conduct to constitute legal cause." *Lear Siegler,* 819 S.W.2d at 472.

*Lear Siegler* involved allegations of both negligence and strict liability. The defendant had been granted a summary judgment on the basis that the manufacturer had negated causation under both theories of liability. The court of appeals reversed the summary judgment and remanded the case for trial.

In reversing the judgment of the court of appeals and rendering judgment for the manufacturer, the Court's causation analysis is subject to two possible interpretations. First, the Court appears to have used a policy-based causation analysis, rather than a cause-in-fact inquiry. Indeed, the opinion does not mention the words "cause-in-fact" at all, but uses the terms "proximate cause" and "legal cause." Thus, when the Court quoted a passage from the *Restatement (Second)* that says, "it is not enough that the harm would not have occurred had the actor not been negligent," it is unlikely that the Court was engaging in a purely cause-in-fact analysis. Instead, the Court implied that causal relation might be limited for policy reasons, concluding that the injuries to the plaintiff were "too attenuated from the defendant's conduct for liability to be imposed." *Id.* at 472. This analysis is consistent with an inquiry into foreseeability, the prong of proximate cause that incorporates limitations on liability for reasons of policy rather than fact, despite the use of terminology characteristic of the *Restatement (Second).*

The second possible explanation is that the Court did indeed expand the cause-in-fact inquiry in *Lear Siegler.* Professor Powers has suggested as much in his products liability treatise:

> The Supreme Court held that the [defendant] was entitled to summary judgment on the basis that the evidence conclusively showed no cause-in-fact.
>
> On the surface, this holding is extremely surprising.... Normally, concepts such as [responsibility] are part of the "proximate" or "producing" part of causation, but the Court clearly held that they established an absence of *cause-in-fact* in the context of *Lear Siegler.* Although the court did not use these precise words, the idea seems to have been that the defect in the sign may have produced the circumstances or occasion of the accident, but it nevertheless was not a "true" cause-in-fact of the accident.

WILLIAM POWERS, JR., TEXAS PRODUCTS LIABILITY LAW 6–20 (2d ed. Issue 0 1992).

In this case, the Court seems to validate Professor Powers' analysis and relies heavily on the rationale of *Lear Siegler* in its own cause-in-fact analysis. The Court's opinion characterizes the holding in that case in the following words:

> Legal cause is not established if the defendant's conduct or product does no more than furnish the condition that makes the plaintiff's injury possible. This principle applies with equal force to proximate cause and producing cause.

898 S.W.2d at 776 (citations omitted). By relying on *Lear Siegler* in this manner, the Court suggests that the distinction between an attenuated event that merely creates a condition and conduct that has a more direct

effect is part of the cause-in-fact analysis. *But see* KEETON ET AL., *supra*, § 42, at 277–78 (criticizing courts' use of the cause/condition distinction in general and including this criticism as part of the proximate cause—as opposed to cause-in-fact—discussion).

But this view of *Lear Siegler* is plausible only if one accepts two propositions: First, that the *Lear Siegler* Court intended to use the term "substantial factor" in the quote from the *Restatement* synonymously with the use of the same term in *Missouri Pacific.* Second, that the Court's use of the term "legal cause" was synonymous with "cause-in-fact," because *Lear Siegler* repeatedly refers to legal cause, but never mentions cause-in-fact.

On close examination, *Lear Siegler* reveals that neither of these propositions can be true. First, the context of the Court's analysis is consistent only with an inquiry into "foreseeability." In *Lear Siegler,* the Court notes the plaintiff's argument that the malfunction of the defendant's sign was a "but for" cause of the injury, but then concludes that the defendant's conduct was too attenuated "to constitute legal cause." *Lear Siegler,* 819 S.W.2d at 472. The Court did not reject the plaintiff's cause-in-fact contention, but merely noted that legal cause required more: the defendant's conduct, even though a cause-in-fact, cannot be too remote from the injury complained of. This is simply the traditional foreseeability analysis applied in negligence law.

Another instructive aspect of the *Lear Siegler* opinion is its citation to *Prosser and Keeton on Torts.* The passage cited is in Prosser and Keeton's introductory material to the section on cause-in-fact, but the text goes on to explain the relationship between the cause-in-fact and proximate cause (or "foreseeability" in Texas' terminology) analyses. *See Lear Siegler,* 819 S.W.2d at 472 (citing W. PAGE KEETON ET AL., PROSSER AND KEETON ON TORTS § 41, at 264 nn. 5–6 & accompanying text).[2] Given this citation, it seems clear that the Court was acknowledging the relationship between these two

prongs of the causal analysis, and concluded that satisfying one prong alone was insufficient.

This overview of our cases reveals that this Court has never abandoned the distinction between the fact-based analysis of the cause-in-fact inquiry and the policy-based foreseeability inquiry. By interweaving the broad definition of "substantial factor" found in the *Restatement* with the narrow scope of the "substantial factor test" in Texas cause-in-fact analysis, the Court's opinion today obscures this important issue and departs substantially from the traditional approach to causal analysis in Texas law.

### B. The Ill–Defined Second Element in Producing Cause

Causal analysis in negligence differs from that in other areas of the law, notably products liability and deceptive trade practices. The negligence cause of action is itself designed to hold parties responsible for the failure to exercise due care when reasonable persons would foresee that injuries of the type incurred would result from that failure. RESTATEMENT (SECOND) OF TORTS §§ 281–283 (1965); *see also* William Powers, Jr., *Border Wars,* 72 TEX.L.REV. 1209, 1210 (1994) ("If people do not act reasonably, [the negligence] norm demands that they should then compensate those whom they foreseeably injure."). Accordingly, a foreseeability element in the causal analysis establishes a limit to liability for the consequences of negligent acts. WILLIAM POWERS, JR., TEXAS PRODUCTS LIABILITY LAW 6–17.1 (2d ed. Issue 1 1993). Because other causes of action are not limited to only foreseeable injuries, Texas law distinguishes between classes of cases, for example, products liability and deceptive trade practices cases, by using the term "producing cause" rather than "proximate cause."

The fact that a court may not be directly concerned with foreseeability as an element in the causal analysis does not, however, undermine the soundness of a two-prong approach to causation in other contexts. It is

---

2. One possible source of confusion is a typographical error in the citation to Prosser and Keeton in the *Lear Siegler* opinion. The opinion cites to page 254, but the Court could only have intended a citation to page 264.

still useful to inquire first into the factual basis for causation: would the injury have occurred in the absence of the alleged misconduct? If the answer to this inquiry is "yes," then the court should still consider whether the policies or principles at the heart of a cause of action dictate a further limitation on liability. Although we have not written as much about this second policy-based limitation on liability inherent in producing cause, this approach is well-established in Texas jurisprudence.

Texas courts have tended to address causation in short, pithy definitions, commonly describing the distinction between proximate cause and producing cause as follows: "Producing cause is equal to proximate cause without the element of foreseeability." *See, e.g., Peeler v. Hughes & Luce,* 868 S.W.2d 823, 828 (Tex.App.—Dallas 1993, writ granted). But this description is unfortunately intertwined with the following shorthand definition: "[P]roximate cause consists of two elements: (1) cause in fact, and (2) foreseeability." *See, e.g., Missouri P. R.R. Co. v. American Statesman,* 552 S.W.2d 99, 103 (Tex.1977). If both of these formulations are correct, we must conclude that producing cause is equal to cause-in-fact.

This shorthand formulation is problematic for two reasons. First, it obscures the fact that in cases in which producing cause is the applicable standard, the causal analysis includes policy-based considerations. Second, by forcing more policy-based considerations into the cause-in-fact analysis in producing cause cases, this formulation creates a distinction between cause-in-fact in producing cause cases and cause-in-fact in proximate cause cases. At best, using different definitions for the same term is unnecessarily complex and prevents lawyers and jurists from drawing upon precedents in one body of law and applying them in another. At worst, it obscures the true basis for judgments, resulting in confusion and leading to erroneous decisions. A better approach is to apply a uniform definition of cause-in-fact and allow the distinction between producing and proximate cause to be made in the development of the policy-based second part of the causal analysis.

If one accepts the wisdom of maintaining a two-prong approach to causation in producing cause, the further task remains of defining the second prong in a clear and workable manner. Our failure to delineate this factor has not gone unnoticed. *See, e.g.,* POWERS, *supra,* at 6–2 (2d ed. Issue 0 1992) ("Texas courts have given little attention to its precise contours."). Additionally, our oft-repeated definition of producing cause is unnecessarily vague, stating only that producing cause is:

> [a]n efficient, exciting or contributory cause, *which, in a natural and continuous sequence,* caused in whole or in part the occurrence or injuries, if any, in question, and but for said cause the occurrence or injuries would not have occurred.

*General Motors Corp. v. Hopkins,* 548 S.W.2d 344, 351 n. 3 (Tex.1977) (emphasis added).

Other authorities may help give content to this broad definition. Prosser and Keeton's discussion of proximate cause provides one reference that can be usefully applied to producing cause:

> In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond. But any attempt to impose responsibility upon such a basis would result in infinite liability for all wrongful acts, and would "set society on edge and fill the courts with endless litigation." As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability. Some boundary must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy.

KEETON ET AL, *supra,* § 41, at 264 (footnote omitted).

In setting the limits to producing cause in products liability law, we must examine the underlying purposes of that branch of tort law. When this Court adopted Section 402A of the *Restatement (Second), see McKisson v. Sales Affiliates, Inc.,* 416 S.W.2d 787, 788–90 (Tex.1967), we implicitly accepted the view

that one purpose of products liability law is "that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained." RE-STATEMENT (SECOND) OF TORTS § 402A cmt. c (1965). As one of the framers of modern products liability law, Judge Roger Traynor, has also observed, primary goals of strict products liability are: (1) to spread the losses caused by defective products from the individual to the public at large; and (2) to deter the manufacture of dangerously defective products. See Escola v. Coca Cola Bottling Co., 24 Cal.2d 453, 150 P.2d 436, 441 (1944) (Traynor, J., concurring). Prosser and Keeton identify three policies: (1) to place the burden of loss on those who can spread the costs of injuries to all purchasers; (2) to promote accident prevention; and (3) to relieve injured consumers of the often impossible burden of proving a manufacturer's negligence. KEETON ET AL., supra, § 98, at 692–93.

Based on these policies, one logical limit for liability in product liability cases would be to restrict recovery to those damages caused by the use of the defective product and to those damages against which manufacturers can feasibly insure. In determining which damages are caused by the use of the defective product, courts should draw upon precedents in negligence law that define the importance of intervening human causes, see, e.g., City of Austin v. Schmedes, 154 Tex. 416, 279 S.W.2d 326 (1955), that define the scope of liability to potential rescuers, see, e.g., Snellenberger v. Rodriguez, 760 S.W.2d 237 (Tex.1988), and that determine when another's conduct is the sole cause of the injury. See, e.g., Dallas Ry. & Terminal Co. v. Bailey, 151 Tex. 359, 250 S.W.2d 379 (1952).

These policy-based limitations can be refined even further in specific applications. In design defect cases, for example, the determination of a product's defectiveness depends on a "hindsight test" that evaluates the product defect in relation to the dangers known at the time of trial. See General Motors Corp. v. Hopkins, 548 S.W.2d 344 (Tex.1977). In determining causation in this context, it is appropriate to limit liability cases to those injuries which would have been foreseeable had this knowledge been available at the time the product was sold. Similarly, in warning defect cases, when a failure to warn constitutes a defect only if the risk was reasonably foreseeable when the product was sold, see General Motors Corp. v. Saenz, 829 S.W.2d 230 (Tex.App.—Corpus Christi 1991), rev'd on other grounds, 873 S.W.2d 353 (Tex.1993), it is appropriate to limit liability to foreseeable injuries, essentially applying the causation standard for negligence.

Obviously, one cannot sketch all the contours of this element of producing cause in a single opinion. Nonetheless, there is ample precedent in Texas law to conclude that a policy-based aspect of causation in products liability law should and does exist.

## III.  Applying the Law to Allbritton's Claim

This case does not present a question of cause-in-fact. The pump defect clearly was a "but for" cause of Allbritton's injuries: assuming the truth of Allbritton's allegations, as we must in this summary judgment case, if the pump had not been defective, there would have been no fire, and Allbritton would have gone home uninjured at the end of her shift. Assuming the substantial factor test from Section 432(2) of the Restatement (Second) applies, the pump defect was also a substantial factor in her injury. The pump was the undisputed cause of the fire, which created a crisis at the plant.[3] Because the pump defect was clearly a but-for cause and a substantial factor, the pump defect was a cause-in-fact of Allbritton's injury.

But determining that the defect was the cause-in-fact of Allbritton's injuries does not end the inquiry. See Lear Siegler, 819

---

3. This is clearly distinguishable from a mere condition. If Allbritton had sued the producer of the chemicals which caught on fire, we would reject such a claim because it was not a substantial factor in the injury; the chemicals can fairly be characterized as a mere background condition. But that cannot be the case for the very pump that started the fire. One might as well characterize the fire itself as a normal background condition found in manufacturing plants.

S.W.2d at 472. We must decide whether the pump defect meets the second prong of both proximate cause and producing cause. In proximate cause, this other element is foreseeability, but it also incorporates policy driven decisions such as when subsequent events will be treated as intervening causes. POWERS, *supra*, at 6–17.1 (2d ed. Issue 1 1993). In this case, the injury to Allbritton was not foreseeable. Allbritton's injuries were the result of a needlessly dangerous shortcut taken after the crisis had subsided.[4] Holding Union Pump liable for Allbritton's failure to use proper care in exiting the area of the fire after the crisis has ended is akin to holding it liable for an auto accident she suffered on the way home, even though the accident probably would not have occurred had she left after her normal shift. Foreseeability allows us to cut off Union Pump's liability at some point; I would do so at the point the crisis had abated or at the point that Allbritton and Subia departed from their usual, safe path.

For similar reasons, Allbritton's products liability claim—which hinges on producing cause rather than proximate cause—also fails. As described in Part II(B) above, the "other element" of producing cause limits Union Pump's liability to the types of injuries that flow naturally from the use of a defective product. Under this standard, liability for a product defect extends only to the damages occurring in a natural and continuous sequence from the use of the defective product, whether to those who use the product or those who are exposed to danger when the defect becomes manifest.

There are two potential applications of this standard to Allbritton, both of which lead to the conclusion that the product defect was not the producing cause of Allbritton's injuries. First, Allbritton's injuries did not occur in a "natural and continuous sequence" from the defect. While the fire was certainly part of such a sequence, as were the efforts to extinguish the fire, Allbritton's injuries occurred after these events had subsided. At the time of her injury, she was simply exiting

the area and in doing so unnecessarily chose to take a precarious shortcut across the pipe rack. Under these circumstances, Allbritton's injuries did not flow in a natural and continuous sequence from the pump failure.

Additionally, from the facts in this record, it does not appear that Allbritton was within the scope of protection intended by products liability law. Certainly, Allbritton was within such scope when she was directly addressing problems flowing directly from the fire's existence. But when this task was completed, she re-entered the area to check a valve, completed her assignment, and was exiting the area when she was injured. When undertaking such activities, Allbritton was no longer within the scope of the protection of products liability law. Accordingly, Union Pump's liability should not extend to the injuries that she suffered.

Regardless of whether the Court agrees with my analysis of proximate and producing cause, by forcing the policy-based limitations on claims into the cause-in-fact analysis without a clear accounting of its reasoning, the Court unnecessarily perpetuates confusion in this fundamental area of the law. For these reasons, I concur in the Court's judgment but do not join its opinion.

SPECTOR, Justice, dissenting.

The summary judgment evidence in this case does not negate causation as a matter of law.

The record reflects that at the time Sue Allbritton's injury occurred, the forces generated by the fire in question had *not* come to rest. Rather, the emergency situation was continuing. The whole area of the fire was covered in water and foam; in at least some places, the water was almost knee-deep. Allbritton was still wearing hip boots and other gear, as required to fight the fire. Viewing all the evidence in the light most favorable to Allbritton, I agree with Justice Cornyn that the pump defect was both a "but-for" cause and a substantial factor in bringing about

---

4. My conclusion might be different had Allbritton taken the shortcut under emergency conditions because it is foreseeable that workers might take extraordinary risks in trying to extinguish a dangerous fire.

Allbritton's injury, and was therefore a cause in fact.

This case is markedly different from the two main cases on which the majority relies: *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470 (Tex.1991), and *Bell v. Campbell,* 434 S.W.2d 117 (Tex.1968). In each of those cases, a defendant's negligence simply created a condition that attracted an individual to the scene, where a negligent third party inflicted an injury. Here, in contrast, there was no negligent third party. To whatever extent Allbritton's own negligence may have contributed to her injury, a jury should be allowed to allocate comparative responsibility.

Because Union Pump has failed to establish its right to summary judgment as a matter of law, I dissent.