ALLIEDSIGNAL, INC. and DaimlerChrysler Corporation,
Appellants,

v.

Yvonne MORAN, Individually, as next friend of Autumn Rhae Moran, and as personal representative of the Estate of Bart Moran, Deceased, Appellee.

No. 13–00–537–CV.

Court of Appeals of Texas,
Corpus Christi–Edinburg.

May 17, 2007.

**20**

Richard W. Crews, Jr., Linda C. Breck, Brin & Brin, Thomas F. Nye, Vidaurri, Lyde, Gault & Quintana, J. A. 'Tony' Canales, Canales & Simonson, P.C., Corpus Christi, Trek C. Doyle, David C. Duggins, Roy A. Spezia, Ken Ferguson, Marnie A. McCormick, Clark, Thomas & Winters, P.C., Austin, for Appellants.

William R. Edwards III, William R. Edwards, John Blaise Gsanger, The Edwards Law Firm, L.L.P., Filemon B. Vela, Constant & Vela, Corpus Christi, for Appellee.

Vilma Luna, Austin, for ad litem.

## OPINION ON REHEARING

Opinion on rehearing by Justice GARZA.

In this opinion, we review the appeals of two defendants from a money judgment entered on a jury verdict in a products liability action.[1] The action arises from the death of Bart Moran, a motorist who was killed when the seat belt in his Dodge Caravan failed to restrain him in a collision with another automobile. We reverse the judgment in part and affirm in part.

---

1. A panel of this Court issued an opinion in this case on August 27, 2003. *See AlliedSignal, Inc. v. Moran,* No. 13–00–00537–CV, 2003 WL 22014805, 2003 Tex.App. LEXIS 7306 (Corpus Christi, August 27, 2003). The opinion reversed the underlying judgment and remanded the case for a new trial. *Id.* The Plaintiffs subsequently filed a motion for rehearing and motion for rehearing en banc. *See* TEX.R.APP. P. 49.1, 49.7. The motion for rehearing was denied by a panel of the Court by separate order on May 17, 2007.

A member of the Court has requested a vote on the Plaintiffs' motion for rehearing by the en banc Court. *See id.* 41.2(c). The motion has been put to a vote. The Plaintiffs' motion for en banc rehearing is granted, the panel's original opinion is withdrawn, and the en banc Court issues the following unanimous opinion. *See id.*

 Justice Rose Vela did not participate in the Court's decision.

## Background

Mr. Moran's wife and daughter ("the Plaintiffs") sued three defendants for causing Mr. Moran's death. One defendant was AlliedSignal, Inc. ("Allied"), the company which manufactured the seat belt buckle in Mr. Moran's Dodge Caravan. Among other things, the Plaintiffs asserted claims for strict products liability based on a defect in the design of the seat belt buckle. The Plaintiffs also sued the manufacturer of the Dodge Caravan, Daimler-Chrysler Corporation ("DCC"), asserting claims for strict products liability based on a design defect in the seat belt buckle. The third defendant sued by the Plaintiffs was Luvh Rakhe, the driver of the automobile that collided with Mr. Moran's automobile. The Plaintiffs sued Mr. Rakhe for negligence, alleging that he caused the accident in which Mr. Moran was killed.

The case was tried to a jury, which found that Mr. Rakhe was at fault for the accident and that Mr. Moran had not been negligent. The jury found that Mr. Moran was wearing his seat belt immediately before the accident. The jury also found that a design defect in the seat belt buckle at the time it left the possession of DCC was a producing cause of Mr. Moran's death. No strict liability questions were submitted to the jury as to Allied. In a comparative responsibility question, the jury found that Mr. Moran's death was 99% attributable to the defective seat belt buckle and 1% attributable to the negligence of Mr. Rakhe. The trial court entered a final judgment on the verdict over the objections of Allied and DCC. The judgment holds Allied and DCC jointly and severally liable for the damages attributable to the defective seat belt buckle.

Both product defendants have appealed. Allied raises six issues in its appeal. DCC raises four. Mr. Rakhe has not appealed. The Plaintiffs have filed one brief addressing the two appeals together. We sustain Allied's first issue and do not address the others, as they would not entitle Allied to any relief greater than its first issue. Tex. R.App. P. 47.1. We overrule the issues raised in DCC's appeal.

## I. Appeal by Allied

In its first issue, Allied argues that the Plaintiffs "waived their products liability cause of action against Allied by failing to submit a jury issue on whether there was a design defect in the seat belt buckle at the time it left Allied's possession." Brief of Appellant Allied, p. 8. We agree.

A judgment must be supported by the pleadings, the evidence, and the jury's verdict. *Boatright v. Tex. Am. Title Co.*, 790 S.W.2d 722, 727 (Tex.App.-El Paso 1990, writ dism'd) (citing Tex.R. Civ. P. 301). When a jury renders a verdict, any issue which has not been submitted to the jury is waived. *Id.* A judgment cannot be rendered on an omitted issue. *Id.* (citing *Sentry Insurance v. Siurek*, 748 S.W.2d 104, 106 (Tex.App.-Houston [1st Dist.] 1987, no writ); *Howard P. Foley Co. v. Cox*, 679 S.W.2d 58, 66 (Tex.App.-Houston [14th Dist.] 1984, no writ)).

As noted above, the Plaintiffs sued Allied for strict products liability based on a design defect in Mr. Moran's seat belt buckle. In Texas, a party who sells a product in a defective (i.e., unreasonably dangerous) condition is strictly liable for any such defects. *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 426 (Tex. 1997); *see also* Restatement (Second) of Torts § 402A (1965). "The prime requirement for imposing liability on a seller under the rule of strict liability is proof by the plaintiff that he was injured because of a defective condition in the product *when it left the hands of the particular seller.*" *Pittsburg Coca–Cola Bottling*

*Works v. Ponder*, 443 S.W.2d 546, 548 (Tex.1969) (emphasis added); *see also Placencio v. Allied Industrial Int'l, Inc.*, 724 S.W.2d 20, 22 (Tex.1987) ("Placencio met his burden as plaintiff by proving and securing jury findings that both a design and a marketing defect existed when the grinder left Allied's possession and that these defects were a producing cause of the occurrence."); *Wright v. General Motors Corp.*, 717 S.W.2d 153, 155 (Tex.App.-Houston [1st Dist.]1986, no writ) (explaining that "in a product liability case, a plaintiff must prove ... that the defective condition existed at the time the defendant relinquished possession or control of the product"); Comment, State Bar of Texas, Texas Pattern Jury Charges, PJC 71.4 (1997 ed.) ("The plaintiff must establish that the product was in a defective condition at the time it left the hands of the particular seller."). Thus, to prevail on their strict products liability claims against Allied, the Plaintiffs had the burden to prove that Mr. Moran's seat belt buckle was in a defective condition when it left Allied's possession. *See Grinnell*, 951 S.W.2d at 426; *Placencio*, 724 S.W.2d at 22; *Ponder*, 443 S.W.2d at 548; *Wright*, 717 S.W.2d at 155.

At trial, the Plaintiffs offered evidence that the buckle was defective when it left Allied's possession, as well as later, when it left DCC's possession as part of the Dodge Caravan sold to Mr. Moran. There was undisputed evidence that Allied manufactured the buckle and supplied it to DCC. There was also undisputed evidence that DCC installed the buckle in the Dodge Caravan as part of a safety-restraint system.

There was conflicting evidence of who designed the buckle. Allied presented evidence that DCC was the designer of the buckle and that Allied was merely a component part manufacturer that supplied a product in compliance with DCC's specifications. In contrast, DCC put on evidence that Allied was responsible for the actual design and testing of the buckle.

There was no dispute that DCC designed and manufactured the Dodge Caravan sold to Mr. Moran. There was also no dispute that DCC installed the buckle in the Dodge Caravan as part of a safety-restraint system included in its overall product design for the Dodge Caravan.

A central dispute at trial concerned whether the buckle in Mr. Moran's Dodge Caravan was actually defective. The Plaintiffs presented evidence tending to prove that the buckle was defective because its design rendered it unreasonably susceptible to inadvertent release. Allied and DCC offered evidence that the buckle was not defective. In addition, there was evidence that the buckle was defective in design because of its location in the Dodge Caravan, which allowed the buckle to be contacted during a wreck and prevented it from being guarded by the armrest.

The jury charge asked if a design defect existed when the buckle left the possession of DCC:

#### Question No. 2

Was there a design defect in the seat belt buckle in the Moran's Dodge Caravan at the time it left the possession of Chrysler Corporation that was a producing cause of Bart Moran's death?

A "design defect" is a condition of the product that renders it unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use. For a design defect to exist there must have been a safer alternative design.

"Safer alternative design" means a product design other than the one ac-

tually used that in reasonable probability—

(1) would have prevented or significantly reduced the risk of Bart Moran's death in question without substantially impairing the product's utility; and

(2) was economically and technologically feasible at the time the product left the control of Chrysler Corporation by the application of existing or reasonably achievable scientific knowledge.

Answer "Yes" or "No."

Answer: _____

None of the language in Question Number 2 pertained to Allied. In fact, Allied was not mentioned once in the entire jury charge. Allied's attorneys objected to this at the charge conference, as well as post-trial, during a hearing on the Plaintiffs' motion to render judgment on the verdict.[2]

■ The jury was not asked and did not determine whether Allied sold a product in defective condition. Without such a finding, there is no basis for holding Allied strictly liable. *See Grinnell,* 951 S.W.2d at 426; *Placencio,* 724 S.W.2d at 22; *Ponder,* 443 S.W.2d at 548; *Wright,* 717 S.W.2d at 155. Because a judgment cannot be rendered on an omitted issue, we conclude that the trial court erred in rendering a judgment against Allied based on the jury's verdict. *See* TEX.R. CIV. P. 301; *Boatright,* 790 S.W.2d at 727. We further conclude that the error probably led to the rendition of an improper judgment, as evidenced by the discrepancy between the jury's verdict and the judgment rendered by the trial court. *See* TEX.R.APP. P. 44.1(a).

Allied's first issue is sustained.[3] The judgment against Allied is reversed. We

2. The record shows that counsel for Allied objected during the charge conference because "the Charge fails to submit independent responsibility of AlliedSignal." The objection was overruled. *See* TEX.R. CIV. P. 278. Later, at a post-verdict hearing on the Plaintiffs' motion for entry of judgment, counsel for Allied made the following argument:

In this particular case AlliedSignal ... was not submitted in any question to the jury—nowhere does our name appear anywhere in the questions submitted to the jury in this case ... [T]he Plaintiffs seek to have you sign a judgment ... that we are jointly and severally liable for without there ever being a single issue as to my client AlliedSignal ever being submitted to the jury. That is fundamentally wrong and is not consistent with the case law. Question Number 2 that the Plaintiffs submitted to you ... is the question, "Was there a design defect in the seat belt buckle in the Moran Dodge Caravan at the time it left the possession of Chrysler Corporation?" Now, that may be an issue against Chrysler. That is not an issue against AlliedSignal. They could have submitted a separate issue on whether or not there was a design defect in the seat

belt buckle at the time it left the possession of AlliedSignal. They didn't do that. That is not a liability issue against AlliedSignal. We objected to it and the case law is very clear. It cannot be more clear. This Court, if it's to follow the case law of this state, should not enter judgment when no jury issue was submitted against a defendant ...
[T]here is evidence in this record that indicates that the defect is caused because of the location of the buckle in the car, its ability to be contacted during a wreck and its inability to be guarded by the armrest. All that is in the record. It's a fact issue. It needed to be submitted, but it wasn't. It wasn't. There is no issue there that says this was a defect at the time that it left Allied's possession that caused the injuries involved....
Allied's objection was overruled, and the trial court granted the Plaintiffs' motion to enter a judgment on the verdict.

3. In sustaining the issue, we have rejected the possibility that Allied's liability was established implicitly by the jury's verdict. Texas law requires a specific finding that the buckle was defective at the time it left the possession

render a take nothing judgment against the Plaintiffs because the issue of Allied's liability has been waived. *See Boatright,* 790 S.W.2d at 727 ("When a jury renders a verdict, any issue which has not been submitted to the jury is waived.").

## II. Appeal by DCC

Having reviewed and sustained Allied's appeal, we now decide the merits of DCC's appeal. The first issue raised by DCC involves challenges to both the legal and factual sufficiency of the evidence to prove causation. As explained below, we hold that the evidence was both legally and factually sufficient. By its second issue, DCC contends that the trial court erred in failing to charge the jury with allocation of responsibility between DCC and Allied. We hold that no abuse of discretion has been shown because the allocation of responsibility question proposed by DCC was improper and not substantially correct. In its third issue, DCC presents two sub-issues challenging rulings on the admissibility of different evidence offered at trial. We find no reversible error in the rulings. In a fourth issue, DCC contends that the trial court erred in admitting expert testimony on causation. We find no reversible error in the ruling.

## A. Sufficiency of the Evidence

In its first issue, DCC challenges the legal and factual sufficiency of the evidence to prove causation. DCC does not challenge the sufficiency of the evidence in any other respect. BRIEF OF APPELLANT DCC, p. 6. (stating that DCC "has chosen to focus this appeal on the comparatively straightforward issue of whether plaintiffs met their burden with respect to causation").

### 1. Standards of Review

In conducting a legal sufficiency review, we credit evidence supporting the judgment if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). We will sustain a legal sufficiency, or no-evidence, point if the record reveals one of the following: (1) the complete absence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital

---

of each particular defendant sued by the Plaintiffs. *See Grinnell,* 951 S.W.2d at 426; *Placencio,* 724 S.W.2d at 22; *Ponder,* 443 S.W.2d at 548; *Wright,* 717 S.W.2d at 155. Although Allied manufactured the same buckle that was found by the jury to have had a design defect when it was sold to Mr. Moran by DCC as part of the Dodge Caravan, it does not follow that the buckle had a design defect at the time it left Allied's possession. The existence of a design defect depends on whether a safer alternative was available at the time the product changed hands. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 82.005 (Vernon 1997). In other words, the availability of a safer alternative determines whether the product is "unreasonably dangerous." *See Caterpillar, Inc. v. Shears,* 911 S.W.2d 379, 384 (Tex.1995). For a particular seller to be strictly liable, it must be established that a

safer alternative design was available when that seller sold the product. *See id.* ("If there are no safer alternatives, a product is not unreasonably dangerous as a matter of law.").

The Plaintiffs had the burden to prove and secure a jury finding that the buckle was defectively designed when Allied sold it to DCC-that a safer alternative existed at that point in time. *See Grinnell,* 951 S.W.2d at 426; *Placencio,* 724 S.W.2d at 22; *Ponder,* 443 S.W.2d at 548; *Wright,* 717 S.W.2d at 155; *see also* Comment, State Bar of Texas, Texas Pattern Jury Charges, PJC 71.4 (1997 ed.) ("The plaintiff must establish that the product was in a defective condition at the time it left the hands of the particular seller."). The Plaintiffs proposed no such question, and they did not secure the required finding from the jury.

fact is no more than a scintilla; or (4) the evidence established conclusively the opposite of the vital fact. *See Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex.1998). If more than a scintilla of evidence exists, it is legally sufficient. *Lee Lewis Constr., Inc. v. Harrison,* 70 S.W.3d 778, 782 (Tex.2001). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about a vital fact's existence. *Id.* at 782–83.

In conducting a factual sufficiency review, we view all the evidence in a neutral light to determine whether the contested finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, shock the conscience, or clearly demonstrate bias. *Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761–62 (Tex.2003); *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986).

### 2. Strict Products Liability for Design Defects

In *McKisson v. Sales Affiliates, Inc.,* 416 S.W.2d 787, 788–89 (Tex.1967), the Texas Supreme Court adopted section 402A of the Restatement (Second) of Torts on the scope of strict products liability. RESTATEMENT (SECOND) OF TORTS § 402A (1965). Section 402A provides that

(1) one who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

*Id.*

■ A product may be unreasonably dangerous because of a defect in its marketing, design, or manufacture. *Am. Tobacco,* 951 S.W.2d at 426 (citing *Caterpillar, Inc. v. Shears,* 911 S.W.2d 379, 382 (Tex.1995); *Technical Chem. Co. v. Jacobs,* 480 S.W.2d 602, 604–05 (Tex.1972)). A product supplier is strictly liable for any such defects. *Id.;* RESTATEMENT (THIRD) OF TORTS §§ 1, 2 (1998); RESTATEMENT (SECOND) OF TORTS § 402A (1965).

The Texas Legislature has addressed products liability in Chapter 82 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 82.001–.008 (Vernon 1997). Section 82.005 addresses design defect claims:

(a) In a products liability action in which a claimant alleges a design defect, the burden is on the claimant to prove by a preponderance of the evidence that:

(1) there was a safer alternative design; and

(2) the defect was a producing cause of the personal injury, property damage, or death for which the claimant seeks recovery.

(b) In this section, "safer alternative design" means a product design other than the one actually used that in reasonable probability:

(1) would have prevented or significantly reduced the risk of the claimant's personal injury, property damage, or death without substantially impairing the product's utility; and

(2) was economically and technologically feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge.

*Id.* § 82.005.

■ "A claimant must not only meet the proof requirements of the statute but must

26

show, under the common law, that the product was defectively designed so as to be unreasonably dangerous, taking into consideration the utility of the product and the risk involved in its use." *Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 257 (Tex.1999); *see also* RESTATEMENT (THIRD) OF TORTS § 2 (1998) ("A product ... is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design ..., and the omission of the alternative design renders the product not reasonably safe.").

The risk-utility analysis involves consideration of several factors including the following:

(1) the utility of the product to the user and to the public as a whole weighed against the gravity and the likelihood of injury from its use;

(2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive;

(3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs;

(4) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of the general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; and

(5) the expectations of the ordinary consumer.

*Tokai*, 2 S.W.3d at 257 (citing *Grinnell*, 951 S.W.2d at 432).

The determination of whether a product is unreasonably dangerous because of a design defect is often one that involves factual disputes that a party is entitled to have a jury resolve. *Id.* at 260. The issue is one of law only if reasonable minds cannot differ on the risk-utility analysis considerations. *Id.* at 261.

### 3. Causation in Strict Liability Cases

Producing cause is the test for causation in strict liability cases. *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex.1995). A producing cause is an efficient, exciting, or contributing cause, which in a natural sequence, produced the injuries or damages of which the claimant complains. *Id.* The concepts of proximate and producing cause differ in that foreseeability is an element of proximate cause but not of producing cause. *Id.* Common to both proximate and producing cause is causation-in-fact, including the requirement that the defendant's conduct or product be a substantial factor in bringing about the injury that would not otherwise have occurred. *Id.* There may be more than one producing cause. *Coleman v. Cintas Sales Corp.*, 40 S.W.3d 544, 550 (Tex.App.-San Antonio 2001, pet. denied). However, a legal cause is not established if the defendant's conduct or product does no more than furnish the condition that makes the plaintiff's injury possible. *Union Pump*, 898 S.W.2d at 776.

### 4. Legal Sufficiency of the Evidence to Prove Causation

DCC argues that the Plaintiffs produced no evidence or insufficient evidence "supporting the proposition that the alleged defect was the 'but for' cause of any injuries." BRIEF OF APPELLANT DCC, p. 12. We disagree.

DCC states that "appellee's characterization of the evidence can be accepted for purposes of discussing causation." REPLY BRIEF OF APPELLANT DCC, p. 2. We begin with the uncontested jury finding that the seat belt buckle was defective. There is also an uncontested jury finding that Mr. Moran was wearing his seat belt immedi-

ately before the fatal accident. These uncontested findings are critical because they establish the circumstances of the accident and the existence of a design defect in the seat belt buckle. *See Morrell v. Finke,* 184 S.W.3d 257, 285 (Tex.App.-Fort Worth 2005, pet. abated) (holding that unchallenged findings are binding on the court).

In addition to the uncontested findings that Mr. Moran was wearing a defective seat belt immediately before the accident, the evidence supporting the judgment shows that Mr. Moran's seat belt did not restrain him during the accident and that, as a result, he was ejected from his automobile. There is uncontested testimony that Mr. Moran's ejection from the automobile produced the physical trauma that ultimately caused his death. There is also evidence that Mr. Moran's injuries from the accident would not have been fatal if his seat belt had restrained him and prevented his ejection from the automobile.

■■■ DCC argues that the evidence is insufficient to prove causation because there is no reliable expert testimony in the record directly stating that the defective buckle was a producing cause of Mr. Moran's death. We disagree. It is not required that a witness conclusively state that a product caused the plaintiff's injury. *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983). The Texas Supreme Court has long held that causation may be proved by circumstantial evidence. *See Gladewater v. Pike,* 727 S.W.2d 514, 518 (Tex.1987) ("Circumstantial evidence and inferences therefrom are a sufficient basis for a finding of causation."); *Farley v. M M Cattle Co.,* 529 S.W.2d 751, 755 (Tex. 1975) ("Proximate cause, like any other ultimate fact, may be established by circumstantial evidence."); *Lynch v. Ricketts,* 158 Tex. 487, 314 S.W.2d 273, 275–76 (Tex.1958) ("It is well settled ... that negligence and causation, like any other

ultimate fact, may be established by circumstantial as well as direct evidence."); *Peveto v. Smith,* 134 Tex. 308, 133 S.W.2d 572, 576 (1939) (relying on circumstantial evidence to prove negligence and causation); *see also Tex. Elec. Coop. v. Dillard,* 171 S.W.3d 201, 206 (Tex.App.-Tyler 2005, no pet.) ("Cause in fact ... may be proven by circumstantial evidence....").

In *Kindred,* the plaintiffs pleaded strict liability claims based on design and marketing defects. *Kindred,* 650 S.W.2d at 61. The trial court submitted a jury charge question as to the marketing defect claim, but it refused to submit a jury question on the design defect claim. *Id.* at 62. The plaintiffs appealed to the Texas Supreme Court, which reversed the judgment and remanded the case for a new trial. *Id.* at 61.

In sustaining the plaintiffs' issue, the Texas Supreme Court directly addressed the question of whether expert testimony is necessary to prove causation in a design defect case. The two plaintiffs in *Kindred* were injured when they were using a product called "Cono/Prime X," a paint primer. *Id.* at 61. The plaintiffs had been applying the primer for approximately 20 minutes when a fire started. *Id.* at 61–62. At trial, there was evidence that the primer had "a flash point of 53 degrees Fahrenheit, which means that in the presence of oxygen and an ignition source the material would burn when warmed to approximately 53 degrees." *Id.* at 62. The evidence also showed that the temperature in the room where the plaintiffs were working was "about 48 degrees" and that the temperature inside the tanks where they were applying the primer "was about 50 degrees." *Id.* "None of the witnesses could identify the exact ignition source." *Id.*

On appeal, the defendant maintained that the trial court did not err in refusing to charge the jury with a design defect

question. According to the defendant, there was no evidence that a design defect in the product was a producing cause of the injuries. *Id.* at 63. The Texas Supreme Court disagreed:

Although no witness could conclusively state that the product was the cause, the jury could have made that determination from circumstantial evidence. The testimony indicates that Cono/Prime X, as designed, was a "very flammable mixture," which was being applied inside the tank, as Con/Chem intended, when the fire occurred. We hold that the evidence was sufficient to submit the issue to the jury.

*Id.*

This case parallels *Kindred.* In *Kindred,* the paint primer was allegedly defective in design because its composition rendered it unreasonably flammable. *Id.* at 62. The defect manifested itself (at least allegedly) when the product was being used and a fire broke out, causing injuries to the plaintiffs. In this case, the Plaintiffs alleged that the seat belt buckle was defective in design because it was unreasonably susceptible to inadvertent release. The defect manifested itself (at least allegedly) when the product was being used and became inadvertently released, causing Mr. Moran to not be restrained during the automobile accident.

The cases are similar in that no expert could conclusively state exactly how either accident occurred. In *Kindred,* no expert could say how the fire was ignited. Only the circumstances of the fire and the defective design of the product could be established. Similarly, in this case, no expert could say how the seat belt buckle became inadvertently released. Only the circumstances of the inadvertent release and the defective design of the seat belt buckle could be established.

DCC complains that there is no proof establishing exactly how Mr. Moran's buckle became inadvertently released, but that complaint is essentially the same argument rejected by the Texas Supreme Court in *Kindred.* As in *Kindred,* we conclude that a reasonable and fair-minded juror could reasonably infer causation based on the circumstances of the accident and the existence of a design defect that rendered the seat belt buckle unreasonably susceptible to inadvertent release.

### 5. Legal Sufficiency of the Evidence to Prove a Safer Alternative Design

DCC also argues an additional sub-point in its first issue. It contends that there is no evidence or insufficient evidence that Mr. Moran's death "would not have occurred with the Gen IV buckle," a seat belt buckle that the Plaintiffs' offered at trial as evidence of a safer alternative design to the defective buckle used by Mr. Moran, the "Gen III buckle." BRIEF OF APPELLANT DCC, p. 8. According to DCC, there is no evidence "that the manner in which Bart Moran is supposed to have opened the [Gen III] buckle would not have opened the supposedly safer Gen IV or any other seat belt buckle in the world." *Id.* at 11.

Although DCC frames the sub-point as a challenge to causation, we conclude that the sub-point actually relates to the Plaintiffs' burden to prove the availability of a safer alternative design. It is axiomatic that a design defect can exist only if there is a safer alternative design. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 82.005; *GMC v. Sanchez,* 997 S.W.2d 584, 588 (Tex.1999); *Caterpillar,* 911 S.W.2d at 384 ("If there are no safer alternatives, a product is not unreasonably dangerous as a matter of law."); *Boatland of Houston, Inc. v. Bailey,* 609 S.W.2d 743, 746 (Tex.1980) ("defectiveness of the product in question is

determined in relation to safer alternatives"). By definition, a safer alternative design must substantially reduce the risk of injury and be both economically and technologically feasible. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 82.005(b)(1).

■■ DCC contends that the Plaintiffs had the burden to prove that an inadvertent release would not have occurred with the Gen IV under the same or similar circumstances. We disagree. The Plaintiffs' burden was to prove that the Gen IV's alternative design would "substantially reduce the risk of injury and be both economically and technologically feasible." *Id.*

DCC has not contested the jury's finding of a design defect. DCC has conceded that "with all reasonable inferences, appellee may have proven a safer alternative design." REPLY BRIEF OF APPELLANT DCC, p. 3. Because a safer alternative design must, by definition, "substantially reduce the risk of injury and be both economically and technologically feasible," we conclude that there is no merit to DCC's sub-point concerning the Gen IV. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 82.005(b)(1). The sub-point is overruled.

### 6. Admissibility of Testimony by Thomas Horton

In reviewing the legal sufficiency of the evidence on causation we have relied on uncontested jury findings, as well as evidence that cannot be disregarded in a legal sufficiency review. *See City of Keller,* 168 S.W.3d at 827. We have not relied on causation testimony by the Plaintiffs' expert, Thomas Horton, who testified over

objection that "the buckle became unlatched due to an inadvertent contact with Mr. Moran's hand most likely, ... [which] caused the latch plate to come out of the buckle."

In arguing that the evidence is legally insufficient, DCC contends that Mr. Horton's testimony was inadmissible and should not be relied upon to uphold the jury's verdict. These contentions are made in DCC's legal sufficiency challenge, but it appears that DCC intended to raise the admissibility of Mr. Horton's testimony as an additional, separate issue on appeal.[4] Accordingly, we treat this as DCC's fourth issue.

■■ To prevail on the issue, DCC had the burden to establish that the admission of Mr. Horton's testimony probably led to the rendition of an improper judgment. *See* TEX.R.APP. P. 44.1(a). In general, a complaining party does this by showing that the judgment turns on the particular evidence admitted. *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753–54 (Tex.1995). DCC has not made such a showing in its brief.

We have reviewed the entire record and conclude that the error, if any, in the admission of Mr. Horton's testimony did not probably lead to the rendition of an improper judgment. *See* TEX.R.APP. P. 44.1(a); *Alvarado,* 897 S.W.2d at 754. The uncontested jury findings establish as a matter of law that Mr. Moran was wearing his seat belt immediately before the accident. They also establish as a matter of law that the buckle was defectively designed because of its susceptibility to inadvertent release. DCC complains about the

---

4. The "Issues Presented" section of DCC's brief lists four issues. The fourth issue asks, "Did plaintiffs establish that their expert's opinion was sufficiently reliable to be admissible on the issue of whether the seat belt buckle was inadvertently released by bodily contact, when the expert produced no analytical data or other evidence supporting his opinion?" This issue has not been briefed by DCC, except in DCC's first issue, where it contends that the testimony cannot be used to uphold the jury's verdict.

lack of evidence on causation, but the uncontroverted evidence shows that Mr. Moran was not restrained by his seat belt even though he was wearing it. In our view, this case did not turn on how the buckle became inadvertently released, but rather on the facts that (1) the buckle was defectively designed because it was unreasonably susceptible to inadvertent release, (2) Mr. Moran was wearing the buckle at the time of the accident, and (3) the buckle became inadvertently released and did not restrain Mr. Moran during the accident.

In *Kindred,* the Texas Supreme Court held that the jury could infer causation based on circumstantial evidence that (1) the product was defectively designed because it was unreasonably flammable, (2) the product caught fire while being used, and (3) the fire injured the plaintiffs. *See Kindred,* 650 S.W.2d at 63. Similarly, in this case, the jury could infer causation based on circumstantial evidence that (1) the product was defectively designed because it was unreasonably susceptible to inadvertent release, (2) the product was being used and became inadvertently released, and (3) Mr. Moran was injured by the product's failure to restrain him.

We view the question of how the seat belt became inadvertently released, whether by bodily contact or other forces, as analogous to the question in *Kindred* regarding how the product caught fire. In *Kindred,* the experts could not determine how the product caught fire. *Id.* Similarly, in this case, the experts could not determine conclusively how the seat belt buckle became unlatched. Mr. Horton testified that it was "most likely" contact with Mr. Moran's hand that released the buckle; however, Mr. Horton qualified his testimony by stating that it was not "feasible" to determine "exactly how Mr. Moran's hand moved millisecond by millisecond to come down and strike the belt buckle." The defendants cross-examined Mr. Horton on this point:

Q. If I understand it then—and let me see if I can get this. What you're telling us is that you think maybe his hand hit the button but you don't have any physical evidence to support that?

A. Nor would you expect there to be any but that's what I think happened, yes.

Q. So I want to make sure I'm right. You think his hand hit the button but you have no physical evidence to support that?

A. That is correct.

In addition to the foregoing cross-examination, the defendants presented evidence tending to prove that Mr. Moran's hand could not have come into contact with the buckle, as suggested by Mr. Horton. The defendants' experts did not offer any alternative theories of how the buckle became released. Instead, they testified that the buckle was not worn by Mr. Moran at the time of the accident and that it therefore did not become inadvertently released. Such opinions are untenable now that it has been established that Mr. Moran was wearing his seat belt.

Even assuming, for the sake of argument, that Mr. Horton's testimony was inadmissible and should not be considered, we are left with a situation exactly like *Kindred,* where no expert could conclusively explain how the fire got started. In this case, the belt became unlatched, but no expert could identify how that happened. As in *Kindred,* the issue of causation turns on the circumstances of the accident, which have gone largely uncontested by DCC on appeal. For these reasons, we conclude that there was no reversible error in the admission of Mr. Horton's testimony.

DCC's fourth issue is overruled.

### 7. Factual Sufficiency of the Evidence to Prove Causation

 DCC also challenges the factual sufficiency of the evidence to prove causation. The challenge is only one sentence long. *See* BRIEF OF APPELLANT DCC, p. 12 ("At the very least, the evidence overwhelmingly preponderates in DCC's favor, and this Court should reverse and remand the case to the trial court."). DCC's brief does not identify the evidence that "overwhelmingly preponderates in DCC's favor." *Id.* DCC does not make any arguments to substantiate its contention that the evidence is factually insufficient. *See* TEX.R.APP. P. 38.1(h). Nevertheless, we have reviewed all of the evidence in the record in a neutral light to determine if it is factually sufficient. *See Golden Eagle Archery,* 116 S.W.3d at 761–62. At trial, DCC offered evidence to prove that Mr. Moran was not wearing his seat belt at the time of the accident and that Mr. Moran's seat belt buckle was not defective. To rebut the Plaintiffs' allegations and evidence that the seat belt buckle became inadvertently released during Mr. Moran's accident, DCC produced expert testimony tending to prove that, under the circumstances of the accident, Mr. Moran's buckle could not have become inadvertently released by bodily contact.

As previously discussed, the jury found (and DCC has not contested) that, immediately before the accident, Mr. Moran was wearing a seat belt that was unreasonably dangerous because of its susceptibility to inadvertent release. The uncontested evidence at trial proved that Mr. Moran was not restrained by a seat belt during the accident. These are circumstances tending to prove the required element of causation. Although the Plaintiffs' evidence of causation is thus circumstantial (with the exception of the testimony of Mr. Horton, on which we do not rely), causation may be established through circumstantial evidence. *Gladewater,* 727 S.W.2d at 518; *Kindred,* 650 S.W.2d at 63; *Farley,* 529 S.W.2d at 755; *Lynch,* 314 S.W.2d at 275–76; *Peveto,* 133 S.W.2d at 576; *Tex. Elec. Coop.,* 171 S.W.3d at 206.

 In sum, our review of the record shows that there is mixed evidence on the element of causation. We believe that based on this evidence rational jurors could reasonably reach different conclusions on whether the defect was a producing cause of Mr. Moran's death. We are prohibited from substituting our judgment for that of the jury, even if there is contrary evidence that may "clearly support a different result." *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex. 1998). The existence of conflicting evidence does not render the evidence supporting the jury's verdict factually insufficient. *See Golden Eagle Archery,* 116 S.W.3d at 761–62 (explaining that jury's finding must be so contrary to "the great weight and preponderance of the evidence as to be manifestly unjust, shock the conscience, or clearly demonstrate bias"). To the contrary, when there is conflicting evidence, the jury's verdict is generally regarded as conclusive. *Beall v. Ditmore,* 867 S.W.2d 791, 796 (Tex.App.-El Paso 1993, writ denied).

 Having reviewed all the evidence in a neutral light, we conclude that it is not factually insufficient. Again, we reiterate that DCC has not presented any arguments to demonstrate how the evidence is factually insufficient. *See* TEX. R.APP. P. 38.1(h). Although we have examined the record to evaluate DCC's challenge, we are not required to construct arguments to support DCC's contention. *See Aluminum Chems., Inc. v. Bechtel Corp.,* 28 S.W.3d 64, 68 (Tex.App.-Texarkana 2000, no pet) ("It is not the proper function of this Court to create arguments

for an appellant. We are restricted to addressing the arguments actually raised, not those that might have been raised."). We are not required to detail the evidence supporting the judgment. *See Gonzalez v. McAllen Med. Ctr., Inc.,* 195 S.W.3d 680, 681 (Tex.2006) ("[N]either the appellate rules nor this Court require detailed recitations of the evidence when a factual sufficiency complaint is overruled.").

Nevertheless, because "merely stating that ... [the challenge] is overruled does not count as providing the 'basic reasons' for that decision," we have attempted to address the limited challenge presented by DCC. *Id.* We overrule DCC's challenge because DCC has not demonstrated how the evidence fails to meet the factual sufficiency standards set by the Texas Supreme Court. *See* Tex.R.App. P. 38.1(h). In addition, our review of the record shows that, although causation was hotly disputed at trial, the jury's finding is not contrary to the great weight and preponderance of the evidence.

DCC's first issue is overruled.

### B. Jury Charge on Proportionate Responsibility

In its second issue, DCC argues that the trial court erred in failing to charge the jury with allocation of responsibility between DCC and Allied.

#### 1. Standard of Review

■■■■■ To determine whether an alleged jury charge error is reversible, we consider the parties' pleadings, the evidence presented at trial, and the charge in its entirety. *See Hyundai Motor Co. v. Rodriguez,* 995 S.W.2d 661, 663 (Tex.1999). The goal of a jury charge is to submit the issues for decision logically, simply, clearly, fairly, correctly, and completely, and the trial court has broad discretion in accomplishing that end as long as the charge

is legally correct. *Id.* at 664. A trial court must submit "such instructions and definitions as shall be proper to enable the jury to render a verdict." Tex.R. Civ. P. 277; *see also Union Pac. R.R. Co. v. Williams,* 85 S.W.3d 162, 166 (Tex.2002). A party is entitled to a jury question, instruction, or definition if the pleadings and evidence raise an issue. *Williams,* 85 S.W.3d at 166 (citing Tex.R. Civ. P. 278). This is a substantive, non-discretionary directive to trial courts, requiring them to submit requested questions to the jury if the pleadings and any evidence support them. *Elbaor v. Smith,* 845 S.W.2d 240, 243 (Tex.1992).

■■■■ Our procedural rules state that any complaint about a jury charge is waived unless specifically included in an objection. Tex.R. Civ. P. 274; Tex.R.App. P. 33.1(a)(1); *In the Interest of B.L.D.,* 113 S.W.3d 340, 349–50 (Tex.2003). A party must make the trial court aware of the complaint, timely and plainly, and obtain a ruling. *B.L.D.,* 113 S.W.3d at 349; *State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 241 (Tex.1992).

Texas Rule of Civil Procedure 278 provides:

> Failure to submit a question shall not be deemed a ground for reversal of the judgment, unless its submission, in substantially correct wording, has been requested in writing and tendered by the party complaining of the judgment; provided, however, that objection to such failure shall suffice in such respect if the question is one relied upon by the opposing party.

Tex.R. Civ. P. 278.

The Texas Supreme Court has also given the following guidance on issue preservation:

> There should be but one test for determining if a party has preserved error in

the jury charge, and that is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling. The more specific requirements of the rules should be applied, while they remain, to serve rather than defeat this principle.

*Payne,* 838 S.W.2d at 241.

■■■ Finally, the omission of a proper question from a jury charge is reversible only if it "probably caused the rendition of an improper judgment." TEX.R.APP. P. 44.1(a)(1). Error in the omission of an issue is harmless "when the findings of the jury in answer to other issues are sufficient to support the judgment." *Shupe v. Lingafelter,* 192 S.W.3d 577, 579 (Tex. 2006) (per curiam); *see Boatland of Houston,* 609 S.W.2d at 750 (holding that even if submission was improper, error was harmless); *see also City of Brownsville v. Alvarado,* 897 S.W.2d 750, 752 (Tex.1995) (explaining that a jury question may be immaterial, and therefore its submission harmless, "when its answer can be found elsewhere in the verdict or when its answer cannot alter the effect of the verdict").

### 2. DCC's Objections and Proposed Jury Question Number 4

DCC's complaint on appeal concerns Jury Question Number 4, which reads as follows:

If you have answered "Yes" to Question No. 2 and/or 3 for more than one of those named below, then answer the following question. Otherwise, do not answer the following question, and go directly to Question No. 7.

The percentages you find must total 100 percent. The percentages must be expressed in whole numbers. The percentage of causation attributable to a person, company, or product is not necessarily measured by the number of

acts, omissions, or product defects found. The percentages attributable to a person, a company, or product need not be the same percentage attributed to that person, that company, or that product in answering another question.

#### Question No. 4

For each person or product found by you to have caused the occurrence or Bart Moran's death, find the percentage caused by—

| | |
|---|---|
| a. The seat belt buckle | ___ % |
| b. Luvh Rakhe | ___ % |
| c. Bart Moran | ___ % |
| Total | 100 % |

At the charge conference, DCC made the following objection to proposed jury question number four:

[**Counsel**]: Defendant DaimlerChrysler objects to Question Number 4. It is the question that deals with comparative responsibility. We object to the form of that question for the following reasons:

\* \* \*

Texas Rule of Civil Procedure 277. . . .

\* \* \*

That's the basis, number one, for our objection, Your Honor.

Basis number two has to do with the statutory requirement imposed on this Court, namely in Chapter 33, a sequence of the Civil Practice and Remedies Code.

\* \* \*

For that reason, Your Honor, we object to Question Number 4.

The third basis for our objection to Question Number 4 of the Court's proposed question has to do with the constitutional violation DaimlerChrysler Corporation is entitled to a trial by

jury, and we would refer the Court to Article 1, Section 15 of the Texas Constitution. Specifically, Your Honor, what we are objecting to in Question 4 is the fact that the way that the case is being submitted under Question 4 is under (A) the seat belt buckle, (B) Luvh Rakhe, (C) Bart Moran. And we believe the proper submission, Your Honor, would include Bart Moran, Luvh Rakhe, Chrysler Corporation, (seat belt system in the 1997 Dodge Caravan), and Alliedsignal, Inc., (seat belt system in the 1997 Dodge Caravan).

And, Your Honor, we have ... prepared a question in correct form. We would ask, first of all, the Court to consider our objection and rule on the objection.

**THE COURT:** Your objection is overruled.

**[COUNSEL]:** Okay. At this point, we would tender Question 4 in the correct form as required.

DCC offered the following proposed jury question, which was refused by the trial court, as shown in both the clerk's record and the reporter's record on appeal:

## [DCC'S PROPOSED] QUESTION NO. 4

For each person or product found by you to have caused the occurrence or injury, find the percentage caused by—

| | | |
|---|---|---|
| A. | Bart Moran | ___ % |
| B. | Luvh Rahke | ___ % |
| C. | Chrysler Corporation (seat belt system in the 1997 Dodge Caravan) | ___ % |
| D. | Allied Signal, Inc. (seat belt system in the 1997 Dodge Caravan) | ___ % |
| | TOTAL | 100 % |

### 3. Appellate Argument by DCC

In relevant part, DCC argues on appeal:

> The evidence presented a fact issue as to whether DCC was liable, AlliedSignal, Inc., was liable, or both.... DCC was entitled to have the jury allocate responsibility between the two product defendants, as it expressly requested in its pleading. The jury was not asked to determine whether it found AlliedSignal, Inc. liable, DCC liable, or both. Furthermore, it is impossible to tell how much responsibility the jury attributed to each of these defendants.

BRIEF OF APPELLANT DCC, pp. 19–20.

### 4. Response by the Plaintiffs

The Plaintiffs argue two central points in response: (1) DCC waived its right to a jury question on allocation of responsibility between DCC and Allied by failing to plead a cross-claim for contribution against Allied; and (2) DCC is precluded from relief on appeal because it failed to offer the trial court a substantially correct proposed question.

The Plaintiffs' brief states in relevant part:

> Chrysler and AlliedSignal did file cross-claims for contribution against Luvh Rakhe, the defendant driver. But Chrysler and AlliedSignal did not file cross-claims for contribution against each other. Thus, any right that Chrysler or AlliedSignal had to a question apportioning responsibility between the two of them was waived and the trial court did not err in its charge to the jury.

BRIEF OF APPELLEES, p. 12 (citations and internal omitted).

The Plaintiffs' brief also points out an inconsistency in DCC's appellate brief, where DCC argues that it had a right to

have the jury allocate responsibility between the two product defendants:

> In its brief, Chrysler states that it was "entitled to have the jury allocate responsibility between the two product defendants, *as it expressly requested in its pleading.* CR 13." Chrysler's Brief, p. 19 (emphasis added). The record cite ["CR 13"] is to Chrysler's original answer which simply did not mention AlliedSignal and does not state a claim for contribution against any party.

*Id.* at 12 n. 10.

Finally, the Plaintiffs offer an argument for why DCC's proposed apportionment question was not substantially correct:

> The requested question is not a substantially correct question because no other question [submitted or refused] asked if Chrysler or AlliedSignal individually caused the occurrence or injury.
>
> The requested question requires the jury to apportion responsibility between the two product suppliers, but does not instruct how to do so. While the question instructs to apportion causation "for each person or product found by you to have caused the occurrence or injury," there was no question in which the jury could have found that "Chrysler Corporation" or "AlliedSignal, Inc." caused the occurrence or injury. Apportioning responsibility to Bart Moran or Luvh Rakhe (the defendant driver) is necessarily predicated on a "Yes" finding to Question No. 3, which asked if the negligence of Moran or Rahke was a proximate cause of the occurrence. In the Question No. 4 that was actually submitted, apportioning responsibility to the seat belt buckle is obviously predicated on the jury's "Yes" answer to Question No. 2, which asked if a defect in the seat belt buckle was a producing cause of Bart Moran's death.

But there is no predicate question for the appellants' requested Question No. 4. No question asked if Chrysler or AlliedSignal caused the occurrence or injury. The jury's answer to Question No. 2, that a defect in the buckle was a producing cause of Moran's death, was a product liability question that did not involve any conduct of Chrysler or AlliedSignal. . . .

> There was simply no way for the jury to answer the [proposed] question, and it was not a substantially correct question.

*Id.* at 17–19 (internal citations omitted).

### 5. Reply by DCC

DCC makes the following argument in its reply brief:

> The objections to Question 4 were plainly adequate to preserve error for appellate review. . . . Here, the objection was timely and repeatedly made, a proper question submitted, and a ruling obtained. . . . Just as appellee led the trial court into error by inexplicably resisting a proper proportionate responsibility question, her request that this Court retreat to the arcania of out-dated charge error preservation law is an invitation to error.

REPLY BRIEF OF APPELLANT DCC, pp. 8–10 (internal citations omitted).

### 6. Analysis

 Although the trial involved two product defendants, the Plaintiffs tendered, and the trial court submitted, a jury charge that only allowed the jury to determine whether a defect existed in the seat belt buckle at the time it left DCC's possession as part of the Dodge Caravan. *See Placencio,* 724 S.W.2d at 22 (explaining that strict products liability plaintiffs have the burden to prove and secure jury findings that defect existed when product left defendant's possession and that defect was

a producing cause of occurrence). There was no corresponding liability question for Allied. The jury was not asked whether a design defect existed in the seat belt buckle at the time it left Allied's possession. For this reason, we concluded that the verdict did not support a judgment against Allied. *See Pittsburg Coca–Cola Bottling Works,* 443 S.W.2d at 548 ("The prime requirement for imposing liability on a seller under the rule of strict liability is proof by the plaintiff that he was injured because of a defective condition in the product *when it left the hands of the particular seller.*") (emphasis added); State Bar of Texas, Texas Pattern Jury Charges, PJC 71.4 (1997 ed.) ("The plaintiff must establish that the product was in a defective condition at the time it left the hands of the particular seller."). In the analysis below, we conclude that the absence of a liability question as to Allied also rendered the apportionment question proposed by DCC improper and not substantially correct.

Because the jury charge issue raised by DCC is hotly disputed, we again incorporate the arguments directly out of DCC's brief:

AlliedSignal, Inc. challenges the trial court's judgment on the additional ground that plaintiffs failed to obtain any jury finding against it. Even if this Court sustains that point of error and renders judgment for AlliedSignal, Inc., DCC's point of error complaining of the failure to allocate responsibility between DCC and AlliedSignal, Inc. still presents reversible error [sic]. DCC plead that it was entitled to a proportionate responsibility question, CR 13, DCC presented evidence that it was not entirely responsible for the design of the seat belt buckle, and section 33.003 requires that the jury allocate responsibility among defendants. AlliedSignal, Inc. was a party defendant throughout trial;

therefore, DCC was entitled to a proportionate responsibility question. This Court's ruling on AlliedSignal, Inc.'s first point of error cannot change the history of the case.

BRIEF OF APPELLANT DCC, p. 23 n. 7.

DCC has argued that we "cannot change the history of the case" by sustaining Allied's first issue. We do not purport to do so. Nevertheless, the proper analytical framework for resolving a jury charge error must account for what actually happened before the trial court, what objections were actually made and ruled on, and what proposed jury questions were actually offered and refused. *See* TEX.R. CIV. P. 274, 278; TEX.R.APP. P. 33.1(a)(1); *B.L.D.,* 113 S.W.3d at 349.

The record shows that (1) the trial court did not submit a liability question as to Allied, (2) the Plaintiffs did not propose a liability question as to Allied or object to its absence, and (3) DCC did not propose a liability question as to Allied or object to its absence. On appeal, DCC has not raised a jury charge error regarding the absence of a strict liability question as to Allied. The only issue preserved and presented for our review concerns Jury Question Number 4. *See* TEX.R. CIV. P. 274 ("Any complaint as to a question, definition, or instruction, ... is waived unless specifically included in the objections.").

We agree with the Plaintiffs that DCC's proposed question would have been improper considering the entire jury charge. Without a question first establishing Allied's liability (i.e., that a design defect existed in the buckle at the time it left Allied's possession that was a producing cause of Mr. Moran's death), there was no basis for asking the jury to apportion causation between "(1) Bart Moran; (2) Luvh Rahke; (3) Chrysler Corporation (seat belt system in the 1997 Dodge Caravan); and

(4) Allied Signal, Inc. (seat belt system in the 1997 Dodge Caravan)," as requested by DCC.

DCC argues that "it is impossible to tell how much responsibility the jury attributed to each of these defendants [meaning DCC and Allied]," but it is clear that the jury was never asked about Allied and could not have found that a defect existed at the time the buckle left Allied's possession that a was producing cause of Mr. Moran's death. BRIEF OF APPELLANT DCC, p. 20. The effect of the charge was to submit the case to the jury with only one product defendant. This is clear from Jury Question Number 2, which we quoted in full in our discussion of Allied's appeal.

DCC has not raised any appellate complaint about Jury Question Number 2. Its only complaint about the jury charge is that Jury Question Number 4 should have included Allied because Allied was a named defendant. See TEX. CIV. PRAC. & REM.CODE ANN. § 33.003. We disagree.

The Texas Pattern Jury Charge explains that, to establish strict liability, "The plaintiff must establish that the product was in a defective condition at the time it left the hands of the particular seller." Comment, State Bar of Texas, Texas Pattern Jury Charges, PJC 71.4. Thus, to establish Allied's strict liability, the jury had to find that a defect existed at the time the buckle left Allied's possession that was a producing cause of Mr. Moran's death. See Pittsburg Coca–Cola Bottling Works, 443 S.W.2d at 548; Wright, 717 S.W.2d at 155 (explaining that "in a product liability case, a plaintiff must prove . . . that the defective condition existed at the time the defendant relinquished possession or control of the product"). The jury was not asked and did not find that a defect existed in the buckle at the time it left Allied's possession that was a producing cause of Mr. Moran's death. Without a predicate find-

ing of causation as to Allied, there was no basis for asking the jury to apportion causation to Allied.

 Most importantly, the jury could not have apportioned causation to Allied even if DCC's proposed question had been submitted. Thus, the error if any, is not reversible because it could not have affected the final judgment. See TEX.R.APP. P. 44.1(a). This is clear from the language of DCC's proposed question. It reads, "For each person or product found by you to have caused the occurrence or injury, find the percentage caused by . . . [the individuals listed]." (emphasis added). "Found" and "find" refer to different things. "Found by you" refers to a previous question, whereas "find" prompts the jury to answer the proposed question. Thus, the proposed question would have asked the jury to compare the percentage of causation attributable to each person or product previously found to have caused the occurrence or injury. Yet, there was no previous question in which the jury could have found that a defect existed in the product at the time it left Allied's possession that was a producing cause of Mr. Moran's death. Consequently, even DCC's proposed question would have precluded the jury from apportioning causation to Allied because of the absence of a predicate finding of causation in a previous question.

Nevertheless, DCC argues that section 33.003 of the civil practice and remedies code obligated the trial court to submit Allied in Jury Question Number 4 because Allied was a defendant. Again, we disagree.

Texas Rule of Civil Procedure 277 explains how proportionate responsibility questions are to be submitted to the jury:

In any cause in which the jury is required to apportion the loss among the parties the court shall submit a question

or questions inquiring what percentage, if any, of the negligence or causation, as the case may be, that caused the occurrence or injury in question is attributable to each of the persons *found to have been culpable.*

Tex.R. Civ. P. 277 (emphasis added).

We emphasize the last five words, "found to have been culpable," because they reinforce our previous conclusion that there must be predicate findings of strict liability before a proportionate responsibility question can be submitted to the jury as to specific product defendants. Rule 277 clarifies that a party's status as a named defendant is not itself a sufficient basis for including a party in a proportionate responsibility question. Under Rule 277, the jury must make specific findings of culpability before apportioning loss between parties and products. In a strict products liability case, the predicate finding is that a defect existed at the time the product left the possession of a particular defendant that was a producing cause of the occurrence or injury. *See Placencio,* 724 S.W.2d at 22; *Pittsburg Coca–Cola Bottling Works,* 443 S.W.2d at 548.

Having reviewed the charge in its entirety, we conclude that the question proposed by DCC was not substantially correct. *See Hyundai Motor Co. v. Rodriguez,* 995 S.W.2d 661, 663 (Tex. 1999). Because there was no previous question to establish Allied's strict liability, the question proposed by DCC would have confused the issues before the jury and created the possibility of inconsistent findings. The trial court did not abuse its discretion in refusing the proposed question.

The only sub-issue we have not directly addressed in our analysis is whether the trial court erred in submitting the seat belt buckle rather than DCC in Question Number 4. As noted earlier, the practical effect of the entire jury charge was to submit the case to the jury with only one product defendant. Even DCC seems to concede that under such circumstances the defective product may be listed instead of the defendant in the proportionate responsibility question. *See* Reply Brief Of Appellant DCC, p. 10 ("Submission of the product's responsibility is harmless when there is only one products defendant ...."); *see also Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 432 (Tex.1984) ("The jury will determine the causation attributable to the defective product."). We conclude that there was no error in the trial court's submission of the seat belt buckle in Jury Question Number 4. In any event, the error would be harmless in light of the entire charge.

DCC's second issue is therefore overruled.

## C. Admissibility of Evidence

In its third issue, DCC raises two sub-issues challenging the trial court's rulings on the admissibility of different evidence offered at trial. Specifically, DCC complains that the trial court erred by (1) excluding evidence of Bart Moran's history of cocaine addiction and a prior conviction for aggravated kidnapping and (2) admitting evidence of customer complaints to DCC and the National Highway Traffic Safety Association.

### 1. Standard of Review

The admission and exclusion of evidence is committed to the trial court's sound discretion. *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989). A party seeking to reverse a judgment based on evidentiary error need not prove that but for the error a different judgment would necessarily have been rendered; it must show only that the error probably resulted in an improper judgment.

*McCraw v. Maris,* 828 S.W.2d 756, 758 (Tex.1992); *see also* Tex.R.App. P. 44.1(a). A successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted. *Alvarado,* 897 S.W.2d at 753–54. We determine whether the judgment turns on the challenged evidence by reviewing the entire record. *Id.* at 754.

### 2. Excluded Evidence of Mr. Moran's Drug Addiction & Previous Felony Conviction

#### a. Proceedings at Trial

At trial, DCC attempted to adduce evidence in the form of testimony, medical records, and psychiatric records showing that Mr. Moran had a history of drug abuse and was a convicted felon. The trial court excluded the evidence. On appeal, DCC contends that the evidence was relevant in several ways: (1) "Bart Moran took life-threatening risks and broke the law for over seven years by snorting and injecting cocaine. This evidence tends to discredit plaintiffs' evidence that Bart faithfully followed the law by wearing his seat belt at all times," Brief Of Appellant DCC, p. 25; (2) "The drug addiction was also relevant to the issue of damages, because it bore on Bart Moran's future earning capacity," *id.;* (3) "The drug addiction also bore on ... [the Plaintiffs'] loss of companionship and society claims," *Id.;* and (4) "The excluded evidence establishes beyond a reasonable doubt that Bart Moran was an addicted user of cocaine, that his continued use of cocaine during the marriage substantially undermined his ability to support ... [the Plaintiffs] as a truck driver (or anything else), and that it created a rift in the relationship between Bart [Moran] and ... [his wife]," *id.* at 25–26.

On appeal, DCC has also attempted to demonstrate how the exclusion of the evidence probably led to the rendition of an improper judgment:

> Plaintiffs sought and were allowed to effectively mislead the jury into believing that Bart Moran was a healthy, safety conscious father whose relationship with his wife (while not perfect, whose is?) was certainly loving and who was a generous care-giver to his daughter. The evidence DCC sought to present directly bore on the issue of the quality of the life Mr. and Mrs. Moran shared. DCC was not trying to show Mr. Moran was under the influence when the accident occurred, but the proffered evidence went directly to the issue of how Mr. Moran's addiction negatively affected his marriage and how he did not have a substantial or reliable earning capacity. Had the jury learned the truth regarding Bart Moran's "habits" as they affected the relationship between he and his wife, it is likely that the jury would have reached a different result on liability, and it would certainly have done so with respect to damages.

*Id.* at 29.

Finally, DCC contends that "[e]ven if the evidence had been inadmissible initially as unfairly prejudicial, the trial court erred in excluding it because plaintiffs opened the door for its admission during their testimony." *Id.* DCC then quotes the following portion of the reporter's record of the trial, where Mrs. Moran gave direct testimony about her relationship with her husband and arguably "opened the door" to evidence of drug use and a prior conviction:

Q. Did you and Bart ever do things together?

A. We did.

Q. What did you do?

A. We both shared an interest in music, so we spent a lot of time—he played music. I listened. We both loved theater, so we did a lot of movies together. He enjoyed cooking and so did I, so we cooked together. We attended church together. We did a lot of traveling to and from Liberty together, and we'd often visit my family together. We did things like go out into the beach, picnics, fishing.

Q. Is religion a significant part of your life?

A. Yes, it is.

Q. Did you take your vows at the marriage to heart and very seriously?

A. Yes, sir.

Q. And the part about, "Death do us part," did you take that very seriously?

A. Yes, I did.

Q. Can you tell this jury that your marriage to Bart was an appropriate marriage?

A. No, I can't.

Q. Was there some hard times?

A. There were. There were hard, hard trying times.

Q. Were there times that challenged you to your core?

A. Most definitely.

Q. Were there times that challenged your religious convictions?

A. Yes.

Q. Were you intent on sticking with your marriage vows, nevertheless?

A. Yes, I was.

Q. And to talk about those hard times and how you felt about those hard times in a forum such as this, how do you feel about that?

A. It is extremely difficult for me to talk about Bart or ... [my daughter]. Any time you mention either one of their names, it just really strikes up some emotions with me. They are the most important people in my life.

Q. But as far as the hard times go—

A. I feel somewhat ashamed of some of the things we went through.

Q. Does it scare you?

A. Very.

After the witness was tendered to the defendants for cross-examination, the following exchanged occurred outside the presence of the jury:

Counsel for DCC: Thank you, Your Honor, in the absence of the jury, Your Honor, I would like to make my—first of all, my contention. My contention is that I believe the so-called—the door has been ... opened by the following testimony of this witness; and with the door being opened, I can inquire regarding the ups and downs of her marriages [sic]. She has testified, Your Honor—basically all this is after lunch. That she and her husband had an interest in music, theater, cooking, going to church. They liked to travel together, visit family and go on outings, go fishing, take her religious vows very seriously. They took the vow of death—"until death do us part." They do not have a perfect marriage. They have had hard times. The times have—sometimes have— the hard times have challenged her religion and—and sometimes that— she is afraid—she is ashamed of the times she has endured.

We believe that, Judge, together with the video they have shown to the jury by the Ad Litem, by the photographs that were exhibited by [Plaintiffs' counsel]. . . . I think they are trying to get an issue on the loss of consortium, and I believe that once you do that, you open up the door for us to inquire as to the status of the hard times.

\* \* \*

The whole testimony has been to set up this nice family ... [and] led the jury to believe ... that we destroyed a family and that they are entitled— under the loss of consortium, they are entitled to recover for the loss of the companionship, her grief and so forth. We believe we are entitled to ... come back and rebut those issues. I think they have opened the door.

THE COURT: Anything else?

Counsel for DCC: Yes, one more thing, Judge. She talks about her early ... marriage and how she met ... Mr. Moran and so forth. We would like to be able to inquire as to whether or not Mr. Moran ... [was] previously married, whether or not he withheld that information from her when they were about to get married; and ... [whether] he withheld from her ... that fact of a conviction.

\* \* \*

Counsel for DCC: They have offered and the Court has admitted testimony ... of Viola Gonzalez, question by [counsel for Plaintiffs] ..., "How about ... Yvonne's relationship with Bart? How was that?" Answer ..., "She was determined to make him into a good person, into the best husband possible she could have. She just—I just know that she was everything to him and he was everything to her." I would like to be able to follow that up, Judge, with as to why her ... sister is saying that she would have to make him a good person. The whole family relationship is now open, Judge, and we believe we are entitled to inquire into those areas.

THE COURT: I believe that, of course, the ... witness is fair game once she takes the witness stand in so far as her marriage and the other positions you are taking. However, I believe you can do that without bringing in the conviction or any drug usage. Now, if you want to question her about the fact—and I don't know. I am just assuming here with what you are saying—that—that he was previously married and withheld that, that's fine. Go ahead. Anything else related to ... her relationship with Mr. Moran and the hard times that they may have had; however, I don't think that you need to get into the drug usage....

Counsel for DCC: Very well. I ... want to follow the Court's order, Judge. They have set up the picture of church attendings [sic] and church going. I would like to be able to bring out the fact that during this period of time, one of the reasons he went to CASA, which is the Christians Against Substance Abuse from the church, is because he had been—during their marriage, he had been admitted to Charter Hospital for substance abuse. He was there for sometime, then left to live by himself with a friend. They got back together again. I think I am entitled to be able to quiz her about why he was at Charter Hospital, what was the diagnosis, and whether or not ... this man was using cocaine or not or substance abuse. The whole problem—

THE COURT: I think you can inquire as to the fact that they were separated. I don't think it's necessary to get into the fact that he had been in drug rehab. I think you can question about the fact that ... they were at one time living apart. I think that's what ... you are trying to get to. The fact that it was because he had been in rehab adds nothing to it.

Counsel for DCC: Judge, according to her deposition, the problem or the hard times they had during their marriage was the fact that Mr. Moran was a ... controlled substance abuser. I mean, that was the whole problem. He didn't have a steady job, and that was always a source of discord with the family. This lady always worked, took care of her baby, was the main supplier of income to the family. Her husband was not. Now, she is coming here today to the Court to present herself as a good person, which she is a good person, the question is whether or not she should be compensated by the jury for the loss of this relationship. And she now set up the situation where we have a video of Mr. Moran; we have seen—we have heard testimony that he is a nice person and a family man, and he ... always wore a seat belt, for example. Our contention is, Judge, that people who are in a controlled substance situation, people who two days before the accident had a controlled substance, people who [are] of this nature are not the same type of people who are going to be worried about seat belts. I mean, they don't care about other people— they don't care about their body and they don't care how they take care of themselves, and these aren't the same kind of people that take care of wearing—always constantly always wearing a seat belt.

So we would like to be able to offer all this also to rebut this position that he always had a habit [of wearing his seat belt]. We just do not believe that common sense or common nature dictates, Judge, that a ... person that has got a drug habit or a drug problem throughout this period of time is a kind of person who is going to worry about a seat belt. It's just not consistent with that. So we would like to be able to show the jury that Mr. Moran is not that kind of person[.] [We would like] to be able to rebut what they are saying.

THE COURT: I think you can do that without having to get into the—any drug usage or addictions, whatever you want to call them.

* * *

Like I said, ... it is relevant; however, I think it's too prejudicial. I am not going to let in it. There is means to address what you're concerned about—about whether this man would be a good family provider. I believe that you can quiz all you want about that and the fact that he didn't work or couldn't hold a job. I believe you can quiz to the fact that they were separated.

* * *

Counsel for DCC: What else can we quiz about, Judge? We can do all those things, Your Honor?

THE COURT: I think you can test the marriage. No doubt about it. All that can be done without getting into his drug usage.

After DCC was allowed to make two bills of exceptions, the jury was brought back into the courtroom and DCC cross-examined Mrs. Moran. The cross examination covered the Moran's marital history, their employment records, and past income. Mrs. Moran described Mr. Moran's "difficulty in being the breadwinner of the family." Her testimony established that Mr. Moran had held between five and ten minimum-wage jobs during the three years of their marriage. Counsel for DCC asked Mrs. Moran if her husband's difficulty in keeping a job put a "strain" on their family relationship, and she agreed that it did. Mrs. Moran testified that she and

her husband had "some serious problems" before their child was born. When counsel for DCC attempted to question Mrs. Moran about the "serious problems," counsel for the Plaintiffs objected and the following exchange occurred outside the presence of the jury:

> Counsel for DCC: Judge, all I am trying to show, Judge, is that she does not have the type of a family relationship that she claims to have to the jury, and she is going to be asking for the loss of grief and companionship and the family loss and—for this part of the damages. That's ... what the Pattern Jury Charge proposes. I think we are entitled to be able to show that she doesn't have this particular—did not have this particular cozy relationship with her husband. She had problems with him. She is concerned about the addiction. They want to call it—I call it substance abuse; they want to call it addiction, same thing. It's an addiction. And she can explain the fact—if she wants to be able to say, My husband was dry for the last—since he left Charter Hospital, fine. She can do that. They can do that on redirect. I think I am entitled to show that it was a concern.

> THE COURT: I still haven't changed my mind.

The jury was brought back into the courtroom, and DCC's cross-examination of Mrs. Moran continued in relevant part:

> Q. Well, did you have a conversation with ... [your doctor] regarding the subject of your husband's death?

> A. I am certain that I did.

> Q. And did you express an opinion to the doctor that at some point in time your marriage had been so unbearable, so bad that—that you thought the only

way out of your marriage was if somebody was going to die—would die?

> A. I remember that conversation, and that's—that's a little bit out of context, but yes, I remember that.

> Q. Well, let me back up—so we need to put it in context. The question I have for you is: Were you talking to the doctor about your marriage?

> A. I don't remember specifically if we were talking about the marriage.

> Q. Okay. Were you talking to the doctor about some bad times of your marriage?

> A. I think that would be fair to say, yes.

> Q. And would these bad times in your marriage, that was a point in time toward the end—toward the end of 1997?

> A. If you are asking me if we were talking about the months prior to his death?

> Q. Let me back up. You told this jury that you—you are taking the marriage vows very, very seriously; correct?

> A. Yes, sir.

> Q. And you told the jury that you would only—you would only consider—you took the vows, till death do you part, extremely seriously?

> A. Yes, sir.

> Q. And that the only way out of a bad marriage perhaps would be if somebody happens to die; correct?

> A. Specifically, we were talking about ... divorce.

> Q. Right. In this particular case, did you express to the doctor the fact that, you know, there was [sic] times during your marriage that the only way for the relationship to end would be if somebody would die?

> A. That's correct because I wouldn't have ever divorced my husband, that's correct.

Q. You would take your husband with all his good and all the bad?

A. You bet.

\* \* \*

Q. I understand that, and I respect that. I am just trying to put the context as to what you were telling ... [your doctor]. In that regard, were you expressing to [your doctor] ... a very sad part of your marriage? There was a part of your marriage that was not happy times?

A. Yes, sir.

\* \* \*

Q. Had your husband been to the hospital?

Counsel for the Plaintiffs objected before Mrs. Moran could answer the question, and the following exchange occurred outside the presence of the jury:

Counsel for DCC: Judge, he was doing fine all morning long until we came back from lunch ... and he goes into this litany. All these things that I submit to the Court he opened the door when he talked about all these things about family life. And so once up to that point, I think he was—we discussed it. I am not going to ask any question about her family relationship because he had walked on the line.

But right after lunch, he comes in and talks about the interest in music, the theater, church, traveling together, family visits, outings, fishing, giving this picture of this great family relationship so he can be able then to argue to the jury on the loss of consortium, and I submit to the Court, Judge, that they have opened the door. They cannot on one hand tell us they have got this great perfect life that we have happened to snuff out of her, all right, and then be able to on

the converse show that it wasn't a perfect life. They had problems with this fellow. It just isn't fair for ... our hands to be tied to show the jury that he—they did not have a good life, they did not have a perfect life, that they had problems because of this man's particular problems with cocaine and addiction.

THE COURT: And I am not restraining you from getting into the fact that they did not have a good life or that they had problems in the relationship. I don't think you need to get into cocaine to do that.

\* \* \*

[Plaintiffs' Counsel]: I don't think it's that way, Judge. She came out in direct examination and admitted that there were things there that she was ashamed of. I mean, it's not like we painted a very blissful picture and left out the bad. We ponied it up in more generic terms and put it on the table. [Counsel for DCC] ... has been doing a fine job of portraying the proposition that these folks had their troubles in their marriage. But if it goes to the point of cocaine usage and at Charter Hospital and the hospitalization for addiction that gets to the point of the—then it becomes so prejudicial that it outweighs any relevancy that it may have.

The trial court ruled in favor of the Plaintiffs, and the evidence of drug use and a prior conviction was excluded from trial. As noted above, DCC now contends on appeal that the rulings amount to reversible error. We disagree.

#### b. Analysis

"All relevant evidence is admissible...." Tex.R. Evid. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact more or less probable

than it would be without the evidence." TEX.R. EVID. 401. Relevant evidence cannot be excluded simply because it would create prejudice. *See* TEX.R. EVID. 403; *Castro v. Cammerino,* 186 S.W.3d 671, 681 (Tex.App.-Dallas 2006, pet. denied). Instead, there must be a demonstration that the introduction of the evidence would be unfairly prejudicial to the objecting party. *Castro,* 186 S.W.3d at 681.

■ The record in this case does not show any abuse of discretion. To the contrary, the trial court engaged in a well-reasoned thought process and made rulings calculated to allow the parties to fairly portray the couple's marriage without relying on evidence of prior drug use and conviction. The rulings demonstrate the trial court's concern that the excluded evidence would be unfairly prejudicial. *See* TEX.R. EVID. 403.

On appeal, DCC states that it "was not trying to show Mr. Moran was under the influence [of drugs] when the accident occurred, but the proffered evidence went directly to the issue of how Mr. Moran's addiction negatively affected his marriage and how he did not have a substantial or reliable earning capacity." BRIEF OF APPELLANT DCC, p. 29. The trial court stated several times that DCC could establish the same facts (i.e., a troubled marriage and employment problems) without resorting to evidence of prior drug use and felony conviction.

The record shows that DCC did just that at trial. On cross-examination, Mrs. Moran testified to having serious marital problems. She admitted to seeing a doctor about her marriage. She also testified that her husband did not have a substantial or reliable earning capacity, which put a strain on their marriage. Although Mrs. Moran testified that she took her marriage vows very seriously and would not have divorced her husband, we disagree with DCC's contention that "Mrs. Moran portrayed her marriage as harmonious." BRIEF OF APPELLANT DCC, p. 26. DCC argues that the excluded evidence was admissible to rebut the Plaintiffs' portrait of a "great perfect life," but the Plaintiffs never offered testimony of a "great perfect life." To the contrary, Mrs. Moran admitted that her marriage had serious problems, including problems caused by Mr. Moran's inability to support his family financially.

The record shows that the trial court allowed DCC to present evidence of the couple's marital discord, as well as Mr. Moran's lackluster employment record and history of low-paying jobs. The court stopped at Mr. Moran's drug use and conviction, however, ruling that the evidence "adds nothing" to the case. We share a similar view. We question what additional probative value the excluded evidence would have offered the jury. The trial court ruled that the risk of unfair prejudice greatly outweighed the probative value of the evidence. We do not find any abuse of discretion in the trial court's determination, especially because the court repeatedly guided DCC and its counsel to alternative avenues of establishing the same probative facts without causing any unfair prejudice to the Plaintiffs.

■ DCC contends that the Plaintiffs "opened the door" to evidence of Mr. Moran's drug use and conviction by counsel's direct examination of Mrs. Moran. We disagree. DCC cites *Stinson v. Arkla Energy Resources,* 823 S.W.2d 770, 772 (Tex. App.-Texarkana 1992, no writ), for the proposition that "[a] trial court may allow otherwise inadmissible evidence to rebut testimony." DCC also cites *Trans–State Pavers, Inc. v. Haynes,* 808 S.W.2d 727, 732 (Tex.App.-Beaumont 1991, writ denied), where the court held, "It is clear that once appellees opened the door to the

introduction of such evidence, that the trial court could not in fairness close that door by preventing appellant from rebutting and clarifying the patently unfair impression created."

We do not disagree with the decisions of our sister courts, but we are nevertheless deferential to and in agreement with the trial court's rulings in this case. The record shows that the trial court fully considered whether unfair impressions would be created with or without the evidence of drug use and a prior conviction. The trial court ruled that the excluded evidence had become relevant, but it concluded that the unfairly prejudicial effect of the evidence still rendered it inadmissible. We believe this was the correct result.

There was no evidence that Mr. Moran was under the influence of drugs on the day of the accident. *See Trans–State Pavers*, 808 S.W.2d at 733 ("evidence of alcohol consumption standing alone is inadmissible unless there is further evidence of negligence or improper conduct on the part of the user as is apparent in the case before us"). Nevertheless, DCC offered the evidence of Mr. Moran's prior drug use for the specific purpose of establishing its version of events on the day of the accident (i.e., that Mr. Moran was somehow at fault, ostensibly because of his drug addiction). DCC was very clear on this point at trial. It explained that drug addicts are different from everyone else. It offered the evidence of Mr. Moran's drug use to show that drug addicts "don't care about other people," "don't care about their body," "don't care how they take care of themselves," and "aren't the same kind of people that … take care of wearing a seat belt." DCC offered the evidence to prove that Mr. Moran was not wearing his seat belt on the day of the accident because he had a history of drug addiction and a felony conviction. Even on appeal, DCC

maintains that "it is likely that the jury would have reached a different result on liability," if the evidence of drug addiction and prior conviction had been admitted. BRIEF OF APPELLANT DCC, p. 29.

We believe this would be true only because of the unfairly prejudicial effect of the evidence. As we have already noted, DCC has not challenged the jury's finding that Mr. Moran was wearing his seat belt at the time of the accident. DCC has also not challenged the jury's finding that the seat belt buckle was defective. In addition, there was no evidence at trial that Mr. Moran was under the influence of any drugs or alcohol at the time of the accident. Nevertheless, DCC argues that the "jury would have reached a different result on liability" if it had simply learned that Mr. Moran was a drug addict. *Id.* In our view, this is precisely the type of unfair prejudice that Rule 403 was intended to prevent.

Having reviewed the record, we conclude that the trial court's rulings were proper because they were calculated to avoid an unfairly prejudicial effect that was so powerful (at least in DCC's view) that it could have changed the outcome of the case. DCC's first sub-issue is therefore overruled.

### 3. Evidence of Customer Complaints

In its second sub-issue, DCC contends that the trial court erred by admitting over objection evidence of customer complaints. According to DCC, "The complaints were inadmissible for several reasons, including that they were hearsay and inadmissible under any exception, were not relevant, and were unfairly prejudicial under Texas Rule of Civil Procedure 403." BRIEF OF APPELLANT DCC, p. 33. DCC complains that, "As admitted, they leave the erroneous impression that DCC was

aware of but disregarded a major safety concern." *Id.* at 37.

 As noted above, a successful challenge to an evidentiary ruling usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted. *Alvarado,* 897 S.W.2d at 753–54; *see also* Tex.R.App. P. 44.1(a). We determine whether the judgment turns on the challenged evidence by reviewing the entire record. *Alvarado,* 897 S.W.2d at 754.

DCC argues that the trial court's ruling gave the jury the "erroneous impression that DCC was aware of but disregarded a major safety concern." Brief Of Appellant DCC, p. 37. Although DCC complains that it was harmed on the issue of notice, it also argues that "[n]otice was not an issue in this case" because there were no claims for punitive damages and because notice is not an element of a design defect claim. *Id.* at 33 n. 8.

Under the circumstances, we can only guess at what effect the error, if any, had on the proceedings as a whole. *See* Tex. R.App. P. 44.1(a). It is simply unclear how the evidence influenced the jury. We again find it noteworthy that DCC has not challenged the finding of a design defect. And, again, we question what harm (other than an erroneous finding of a defect) could have been caused by the trial court's alleged error. For these reasons, we conclude that DCC has not shown itself entitled to relief.

DCC's second sub-issue is overruled.

### III. Conclusion

We reverse the judgment of the trial court in part and affirm it in part. *See* Tex.R.App. P. 43.2(a), (c). Specifically, we reverse the portion of the judgment holding Allied liable for damages and render a take nothing judgment on the Plaintiffs'

claims against Allied. *See id.* 43.2(a). The remaining portion of the judgment is affirmed. *See id.* 43.2(c).